In re Vickie Lynn MARSHALL, Debtor.

E. Pierce Marshall, Plaintiff,

v.

Vickie Lynn Marshall, Defendant.

Vickie Lynn Marshall, Counterclaimant,

v.

E. Pierce Marshall, Counter–Defendant.

No. SA CV 01–97 DOC.
Bankruptcy No. LA 96–12510 SB.
Adversary No. AD 96–1838 SB.

United States District Court, C.D. California.

March 7, 2002.

Rusty Hardin, Hardin & Associates, B. Lee Ware, Don Jackson, Ware, Snow, Fogel & Jackson, Houston, TX, Robert E. Mangels, Joseph A. Eisenberg, Herbert A. Bernhard, Julia J. Rider, Jeffer, Mangels, Butler & Marmaro, Los Angeles, CA, G. Eric Brunstad, Jr., Bingham, Dana, Hartford, CT, for E. Pierce Marshall.

Philip W. Boesch, Jr., Howard Stern, Boesch Law Group, Eric Berg, Zelle, Hofmann, Voelbel & Gette, Marina Del Rey, CA, Kent Richland, Sheila S. Kato, Greines, Martin, Stein & Richland, Los Angeles, CA, for Vickie Lynn Marshall.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CARTER, District Judge.

Before the Court is the proposed findings of fact and conclusions of law entered by the bankruptcy court in this matter on October 6, 2000 and November 21, 2000. Beginning on June 25, 2001, this Court conducted a de novo review of the bankruptcy court's proposed findings. From December 11, 2001 to January 8, 2002, this Court conducted an evidentiary hearing wherein it accepted the testimony of the central figures in the case, documentary evidence, and arguments of counsel. After reviewing all of the evidence in this matter, the Court adopts the findings of fact and conclusions of law of the bankruptcy court, with certain amendments, and

makes independent findings of fact and conclusions of law, as set forth below.

## PROCEDURAL HISTORY

Defendant and Counterclaimant Vickie Lynn Marshall (Vickie)[1] is the surviving widow of J. Howard Marshall, II (J. Howard), who died on August 4, 1995. Vickie, also known as Anna Nicole Smith, is a figure of some notoriety from her career as a model. J. Howard was also a figure of some notoriety as he was said to be either the richest or second-richest man in Texas at the time of his death.

The magnitude of the sums of money involved in J. Howard's estate has sparked intensely contested litigation on several fronts. First, succession proceedings[2] took place in Louisiana, but were dismissed in 1998 after the Louisiana Supreme Court found jurisdiction lacking in that state. *See In re Howard Marshall Charitable Remainder Annuity Trust,* 709 So.2d 662 (La.1998). Second, probate proceedings were commenced in Harris County, Texas. The case was tried to a jury and a verdict returned. Judgment was originally entered on August 15, 2001, with Amended Judgments entered on October 15, 2001 and December 7, 2001. Several motions for entry of an amended judgment were filed just before the judgment was to become final on January 7, 2002. On January 11, 2002, the Texas probate court denied those motions. Under Texas law, the judgment became final on February 11, 2002. On February 21, 2002, the bankruptcy court held that parts of the judgment in the Texas probate proceedings

violated Vickie's discharge under the bankruptcy code, and was obtained only after J. Howard's youngest son, E. Pierce Marshall (Pierce) misrepresented to the bankruptcy court which claims he would pursue in the Texas Probate proceeding. *Marshall v. Marshall (In Re Marshall),* 273 B.R. 822 (Bankr.C.D.Cal.2002) *(Marshall V).* Third, on January 25, 1996, a few months after J. Howard's death, Vickie filed for Chapter 11 bankruptcy here in the Central District of California.[3] This bankruptcy case engendered two adversary proceedings with which this Court has had involvement.

In January 1998, Vickie filed an adversary complaint against Finley Hilliard as trustee of the J. Howard Marshall, II Living Trust and as executor of the succession of J. Howard Marshall, II. On July 22, 1998, the Honorable William D. Keller issued an order withdrawing the reference to the bankruptcy court of this proceeding, which thereafter proceeded before Judge Keller. On March 10, 1999, Judge Keller stayed the proceeding, pending the outcome of either the Texas probate proceedings or the present adversary proceeding, which is the subject of this order (the Adversary Proceeding). On November 2, 1999, the proceeding was transferred to this Court. That proceeding remains stayed.

The matter currently before the Court commenced on May 7, 1996, when Pierce filed an adversary complaint seeking a determination that Vickie owed him a debt that was nondischargeable. Pierce alleged

---

1. As all the principals in the matter at hand share the same last name, the Court will refer to the parties by their given names, as is customary in cases involving family members.

2. Louisiana succession proceedings are similar to probate proceedings in most states.

3. The bankruptcy court noted in one of its decisions that Vickie apparently filed for bankruptcy because, after not receiving an inheritance from J. Howard, she lacked money and also because a default judgment had been entered against her on claims brought by her former personal assistant or housekeeper. This claim subsequently settled.

that Vickie had defamed him when, prior to the time she filed for bankruptcy and with her complicity, some of her lawyers told members of the press that Pierce had used forgery, fraud, and overreaching to gain control of J. Howard's assets.[4] On June 11, 1996, Pierce filed a proof of claim in the bankruptcy case. He made the claim by attaching a copy of the complaint from the adversary proceeding.

Vickie responded to both the adversary complaint and the proof of claim. On June 14, 1996, she answered the Adversary Proceeding complaint, asserting, in part, truth as a defense. She also asserted counterclaims for fraudulent transfer, an injunction, conversion, tortious interference, breach of fiduciary duty, abuse of process, fraud, promissory estoppel, breach of contract (third-party beneficiary), the imposition of a constructive trust, an accounting, and indemnity and contribution. As to Pierce's proof of claim, Vickie filed an objection on July 3, 1996.

After the case had gone through significant discovery disputes, Pierce filed a motion to withdraw the reference to the bankruptcy court of the Adversary Proceeding on September 22, 1998. That motion was assigned to Judge Keller for determination. Judge Keller issued a ruling on October 21, 1998 withdrawing the reference, but retaining the services of the bankruptcy judge for discovery purposes. On March 10, 1999, Judge Keller vacated the order withdrawing the reference, effectively returning this matter to the bankruptcy court.

On November 5, 1999, the bankruptcy court granted summary judgment for Vickie on Pierce's Adversary complaint. It found that Vickie had published no

statements about Pierce, had not ratified any statements about Pierce made by her attorneys, and was not otherwise vicariously liable for any statements her attorneys had made about Pierce. Thus, the bankruptcy court held that Vickie had not committed a willful or malicious act under 11 U.S.C. § 523(a)(6).

Vickie's counterclaims against Pierce went to trial in the bankruptcy court in the fall of 1999. Approximately ten months later, on September 27, 2000, the bankruptcy court issued a Memorandum of Decision Following Trial (Original Decision). The Original Decision held that Pierce tortiously interfered with Vickie's expectation of the inheritance she otherwise would have received if she had exercised her right to a widow's election. On October 6, 2000, the bankruptcy court issued an Amended Memorandum of Decision Following Trial (Amended Decision), which superceded the Original Decision. *See Marshall v. Marshall (In re Marshall)*, 253 B.R. 550 (Bankr.C.D.Cal.2000) *(Marshall I)*. The Amended Decision concludes not that Pierce tortiously interfered with Vickie's expectation of an inheritance, but that he interfered with her expectation of an *inter vivos* gift. *Id.* at 553. This was based, in large part, on facts found against Pierce as sanctions for discovery abuses, in addition to the evidence at trial. The bankruptcy court awarded Vickie $449,754,134 in damages. *Id.*

Pierce again filed a motion to withdraw the reference to the bankruptcy court. *See* 28 U.S.C. § 157(d). The case was randomly assigned to this Court for determination. On November 21, 2000, just prior to argument on that motion, the bankruptcy court issued a third order.

---

4. Debts based on "willful and malicious injury," such as intentional torts, are not dischargeable. 11 U.S.C. § 523(a)(6). Damages for libel or defamation are not dischargeable when the statements were published with knowledge of their falsity. *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir.1986).

This decision, the Supplemental Memorandum of Decision Following Trial (Supplemental Decision), does not supercede the Amended Decision, but instead supplements it by explaining that the bankruptcy court had determined that Vickie's counterclaims were core proceedings and by imposing punitive damages of $25 million.

This Court heard oral argument on Pierce's motion to withdraw the reference on December 11, 2000 and then took the matter under submission. The motion was later denied in this Court's Amended Order Regarding Subject Matter Jurisdiction. *See Marshall v. Marshall (In re Marshall)*, 264 B.R. 609, 618 (C.D.Cal. 2001) *(Marshall III)*.

On December 29, 2000, the bankruptcy court entered a final judgment in this matter. *See Marshall v. Marshall (In re Marshall)*, 257 B.R. 35 (Bankr.C.D.Cal. 2000) *(Marshall II)*. Pierce appealed that judgment to this Court.

In April 2001, this Court issued an Order Regarding Subject Matter Jurisdiction holding that the probate exception to federal jurisdiction did not apply, and therefore this Court did have subject matter jurisdiction, but finding that the matter was a non-core, "related to" matter pursuant to 28 U.S.C. § 157(c). Accordingly, the Court deemed the bankruptcy court's Amended Decision and Supplemental Decision as proposed findings of fact and conclusions of law pursuant to 28 U.S.C. § 157(c)(1) and began to undertake a de novo review of the record submitted in this matter. Both parties requested that the Court certify the matter for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). On June 19, 2001, the Court entered an amended decision, certifying the matter for interlocutory appeal. *Marshall III*, 264 B.R. at 633. The parties filed cross-motions for leave to file an interlocutory appeal with the Ninth Circuit, which the Ninth Circuit denied.

On August 27, 2001, this Court held a status conference on the matter and set a schedule for hearing additional evidence. On October 5, 2001, this Court held a hearing on the evidentiary sanctions imposed against Pierce for discovery abuses. In a minute order of that date, the Court found that discovery abuses had taken place, but held in abeyance its decision on sanctions pending this order. In addition, the Court ordered Pierce to produce to Vickie in California several hundred boxes of documents previously withheld. On October 23, 2001, Pierce produced more than 400 boxes of documents to a document repository stipulated to by the parties in El Segundo, California.

On November 2, 2001, Pierce filed a motion to dismiss or alternatively for summary judgment based on *res judicata*. The Court heard arguments on December 11, 2001 and on December 21, 2001, denied Pierce's motion. *Marshall v. Marshall (In re Marshall)*, 271 B.R. 858 (C.D.Cal.2001) *(Marshall IV)*.

Beginning on December 11, 2001, this Court heard evidence in the Adversary Proceeding. The Court heard live testimony from Harvey Sorensen, Edwin Hunter, Jeff Townsend, Vickie Lynn Marshall, and E. Pierce Marshall. The Court also reviewed numerous video and audio tapes, substantial documentary evidence not previously available, evidence and testimony offered by Pierce that the bankruptcy court had excluded as sanctions for Pierce's discovery abuses, and evidence adduced during the Texas probate proceedings. Additionally, the Court reviewed volumes of testimony from depositions and previous court proceedings submitted by the parties. On January 8, 2002, the Court heard argument of counsel and took the matter under submission.

## SANCTIONS

A substantial portion of the findings proposed by the bankruptcy court were imposed against Pierce as sanctions for discovery abuses pursuant to Federal Rule of Bankruptcy Procedure 7037. *Marshall I*, 253 B.R. at 554 n. 5. On October 5, 2001, this Court heard argument on the matter and held in abeyance its decision, pending a further showing of discovery abuse in light of the Court's order requiring the production of documents and a showing of prejudice by Vickie. After hearing evidence, the Court is able to make a determination of this matter on the merits and therefore does not reach the issue of evidentiary sanctions under Federal Rule of Civil Procedure 37(b)(2)(A). Therefore, except to the extent set forth in Footnote 17, the Court makes no findings on the issue of sanctions at this time.

## FINDINGS OF FACT

### I. THE LIFE OF J. HOWARD MARSHALL, II

J. Howard's autobiography, *Done in Oil,* harkens back to a nostalgic period in American history of allegedly self-made entrepreneurs who shaped our country. It recalls a time when the saying "go west young man" was the siren song for men and women of our country who left humble beginnings and crossed the rivers and plains to settle huge expanses of the nation. These ruggedly honest individuals walked the Oregon Trail, settled the Oklahoma territories, worked the California gold fields and inspired phrases like "Remember the Alamo," which needs no explanation to Americans. The myths and the reality of these individuals of character and vision survive and now form a large part of our country's history and folklore.

J. Howard set himself in the context of these enterprising pioneers. Both parties have argued that to understand this case, the Court must understand who J. Howard was and who Vickie is. At the outset, the Court admits to being uncomfortable with testimony that delved so intimately into their private lives. However, after a thorough review of the bankruptcy court's record and the testimony heard by this Court, the parties are correct to emphasize the particular nature of the individuals involved. The Court will therefore set forth some insights into the myths and reality of J. Howard and Vickie.

### A. Background

Born in 1905, J. Howard attended private schools in the northeast part of the United States, including the George School, an exclusive New England prep school, Haverford College, an elite liberal arts college, and Yale Law School, one of the nation's leading law schools, from which he graduated *magna cum laude* in 1931. Although he often derided his undergraduate liberal arts education, he took great pride in the legal training he received at Yale. Upon graduation, he worked as an associate in a New York firm for two years. Subsequently he returned to Yale Law School to teach and later became the Assistant Dean.[5]

In the 1930's, J. Howard worked for the Roosevelt Administration on the proration of oil production. During World War II he continued to work on petroleum supplies and logistics, serving on the government petroleum board.

After the War, J. Howard moved to Ashland, Kentucky and became president of Ashland Oil Company. He subsequent-

---

5. One of the subjects he taught at Yale was wills and trusts. Surely he did not realize at the time that these same subjects would take up large portions of his later life, and dominate his family's affairs for more than six years after his death.

ly became Vice President of Mid–Continent and by the mid 1950's he was working for Signal Oil in California. In 1954, J. Howard was one of the founders of Great Northern Oil and Gas Company. The initial stockholders were Woodley Petroleum, Southern Production, Sylvester Dysone and J. Howard. The wealth of the Marshall family is primarily based on the interest acquired by J. Howard in Great Northern Oil and Gas, the predecessor company to Koch Industries.

### B. First Marriage

J. Howard met and married his first wife, Eleanor Pierce Marshall (Eleanor)[6] in the 1930's. Their marriage produced two children, J. Howard Marshall, III (J. Howard, III) and Pierce.

Eleanor has been described to the Court as a refined, gentile, spiritual, and religious woman. In her sixties, well after her divorce from J. Howard, Eleanor became a minister. Now ninety-seven years old, the Court was told the story that when she was being deposed in one of these related matters, she inquired of counsel how long the deposition would last, because she did not want to miss her dancing lessons later that day. Eleanor was the primary care-giver for Pierce and his older brother due to the absenteeism of J. Howard as he pursued his business ventures.

The older brother, J. Howard, III, has been described to the Court as a true scholar. He attended Cal Tech and graduated at the top of his class. J. Howard, III formed a company in Los Angeles immediately following graduation and has remained a southern California resident throughout his lifetime. J. Howard was immensely proud of J. Howard Marshall, III but disinherited him over a financial

disagreement involving the buy-back of Koch stock, *see* Part I.D, *infra.*

Pierce attended a military academy in Indiana and Webb School in Claremont, California. Subsequently he attended Pomona College, graduating in 1961. Following graduation he worked briefly in Michigan and then served in the Navy from 1963–65. He married in 1965 and he and his wife have been married for over thirty-five years. Pierce worked in California and New York as an investment banker until he moved to Texas in 1968 at the urging of his father. J. Howard wanted Pierce to become involved in oil and gas ventures. Neither Pierce nor J. Howard Marshall, III had spent much time with their father while growing up and the significant bond between Pierce and J. Howard seems to have developed during Pierce's years in Texas working with his father. Throughout the remainder of the 1960's and 1970's Pierce and J. Howard invested together in businesses which ranged from oil and gas to restaurant ownership.

In 1961, the thirty-year marriage between Eleanor and J. Howard dissolved. J. Howard was fifty-five years old at the time of the divorce, and at that time, two trusts were created to hold J. Howard's and Eleanor's now separate property interests. Trust B was formed on behalf of Eleanor and Trust S on behalf of J. Howard. However, Eleanor left her financial affairs in the hands of her former husband because she trusted his business acumen.

### C. Second Marriage

In December 1961, J. Howard married Betty Bohannon Marshall (Betty). At his father's request, Pierce served as the best man. There are no children from this marriage.

---

**6.** Eleanor later re-married and is now Eleanor Stevens.

Betty and J. Howard had met in the mid-1930's. She has been described to the Court as strong, intelligent, street smart, astute in business, and a good match for J. Howard. J. Howard Marshall, III always believed that his father had a long-term relationship with Betty during his marriage to Eleanor.

In 1961, J. Howard accepted the Presidency of Union Texas and he and Betty moved to Houston. When most people are planning for retirement, J. Howard was continuing the pursuit of the business that had been the focus of his life.

J. Howard created what he referred to as a "new community" for he and Betty. Although not formalized until years later, to J. Howard, this new community always existed. It consisted of any assets that he and Betty acquired during their marriage, even if they could be traced back to his own separate property.

In the early 1980's Betty was diagnosed with Alzheimer's disease. Her condition slowly deteriorated until her death in the Fall of 1991.

### D. Koch Industries and the Disinheritance of J. Howard, III

Koch Industries (Koch) is a privately held, integrated petroleum and chemical conglomerate headquartered in Wichita, Kansas. Koch is estimated to be the second largest privately held company in the United States based on revenues of approximately $35 billion dollars. Koch Industries is unique among privately held companies in that it pays out a low dividend and instead reinvests its funds in order to grow the company. To that end, Koch Industries has been an unqualified success, growing at dramatic rates over the last two decades.

Koch's history can be traced back to Great Northern Oil and Gas company, which formed in 1954 with J. Howard owning 16%, Southern owning 40%, Woodley owning 40% and the remaining percentages owned by minority shareholders. Subsequently, Fred Koch purchased Southern's 40% interest in Great Northern. Woodley eventually sold its interest to Pure which subsequently sold to Union Oil. Union Oil then sought to take over Great Northern, and merge it into Union Oil, making it a publicly traded company. J. Howard and the Koch family prevented the takeover.

Fred Koch and J. Howard shared the same ideas about business. Their belief was that earnings should be reinvested in the company to create sustained growth. They also believed their company should be privately held. To them, the management advantages of a privately held company outweighed short-term benefits of going public and making a quick profit in the public market. They wanted to be able to make quick business decisions without being encumbered with the need for shareholder approval, which was time consuming and often divisive. They also did not want to be subject to yearly shareholder demands for high dividend returns. This private business philosophy has been steadfastly adhered to for decades.

The Koch family eventually bought out Union Oil's interest and changed the name to Koch Industries. Fred Koch chose his son Charles Koch to take over as president of Koch Industries. J. Howard promised Fred Koch that he would always support Charles Koch and support keeping Koch Industries a privately held company. Since the late-1960's, Charles Koch has been Chairman and CEO of Koch Industries. On his death, Fred Koch left equal shares of his voting stock in Koch Industries to his four sons, Charles, David, Bill, and Fred Jr. (Freddie).

In 1974, J. Howard Marshall, III wed in Los Angeles. At the reception J. Howard gave each of his sons 4% of the voting common stock. Although legally he would have no voting rights, J. Howard believed he could still control this 8% minority voting right through J. Howard, III and Pierce. Upon giving his sons the stock, J. Howard said: "Boys, these are the Crown Jewels, take care of them."

A disagreement erupted in 1980 between the children of Fred Koch about the future of Koch Industries. Bill and Freddie Koch believed that the best approach was to go public. Charles and David Koch, however, knew that their father would want the company to stay private. A fight for control of the family business ensued.

Freddie and Bill and their allies could count 48% ownership in the company, just short of the majority that they would need to install a new board that would approve a public offering. To find the extra votes, they looked outside the family. Freddie and Bill approached Pierce, now the owner of 4% of the voting stock, and asked him to vote with them, but he declined. However, when Bill and Freddie approached J. Howard, III, he sided with them, giving them the votes needed to oust the old board, including J. Howard. As far as J. Howard, III was concerned, it was time to go public.

When J. Howard heard about this, he felt betrayed. J. Howard had shared the vision of a privately held company and its virtues with Fred and Charles Koch. It can be safely said that he believed that J. Howard, III should never go against the family. J. Howard flew to California to try to change his son's position, but was unable to convince him. J. Howard then made J. Howard, III an offer to buy back the stock for $208 per share, a total of $8 million.

J. Howard took this action despite the fact that he viewed the purchase price as exorbitant. The previous highest transaction for Koch stock had been $80 per share between Koch and its employees. J. Howard felt that he had been forced to pay a premium to obtain this stock from his own son.

Because the dividends could not cover the financing for the $8 million transaction, J. Howard sold the stock back to the company. He had honored his commitment to his friend, the late Fred Koch, but it would have immediate consequences within his own family. J. Howard flew back to Houston and disinherited his eldest son. He considered the $8 million payment an early inheritance and planned to give him nothing more.

With J. Howard's faction firmly in control again, Koch Industries resolved to stay private. At Charles Koch's urging, Koch Industries bought out the stock of the dissident shareholders. The effect of this buyout was that the remaining shareholders' ownership interest nearly doubled. The Koch family (primarily Charles and David Koch) now own more than 80% of Koch's common stock and 88% of its voting stock. The buyout, however, would engender more troubles. Led by Bill and Freddie Koch, the dissident shareholders sued Charles and David Koch, J. Howard, Pierce, and the remaining Koch shareholders. They contended that the price that they received in the buy-out was far below the true value of Koch Industries. Major litigation over billions of dollars commenced.

Charles Koch stated publicly and in sworn testimony that there are no present plans to go public. The Court accepts these representations. His father was dedicated to maintaining Koch as a privately held company and Charles Koch has remained steadfast in adhering to this

goal. Market conditions may eventually force this company to go public, possibly to pay estate taxes. But as of this date, the longevity of this commitment to remain a private company, the lengthy and factious family dispute between Charles Koch and other family members who wanted to take the company public, and Charles Koch's testimony convinces the Court that going public is not a pending or planned event.

Due to the dispute over Koch's true value, reducing the apparent value of Koch Industries became an important goal for Koch shareholders, including Pierce and J. Howard.

### E. J. Howard's New Estate Planning

In 1982, J. Howard embarked on an estate plan to make certain that the Koch stock would never be held hostage. His eldest son was completely excluded as an heir. A comparison of his 1979 will with his 1982 will demonstrates his intent to exclude his eldest son and leave Betty, and upon her death, Pierce, as his heirs. (Ex. 3203.) From 1984, Pierce was the ultimate beneficiary of J. Howard's estate. J. Howard employed attorney Harvey Sorensen to represent him and the various entities he created for his estate plan. He also asked Pierce to assist Sorensen in the creation of these entities.

On July 1, 1984, the company known as Marshall Petroleum, Inc. (MPI) was formed by J. Howard, Betty, and Eleanor in a Section 351 tax-free exchange of property for stock. MPI's assets comprised the separate property of J. Howard from Trust S, the separate property of Eleanor from Trust B, and Betty's share of her and J. Howard's "new community." In May of 1991, the company elected S–Corporation status.

At its formation, J. Howard owned 56% of MPI, Eleanor owned 37%, and Betty owned 7%. In 1989, Eleanor decided that she wanted to increase her charitable giving. She then established a Charitable Remainder Trust, with Pierce as the ultimate beneficiary, and sold a portion of her MPI stock back to the company for cash. In 1991, Betty died and her ownership passed to J. Howard and subsequently to Pierce. Over this time period, Pierce bought stock in MPI and received stock as compensation for his consulting services. By 1992, the ownership changes resulted in J. Howard controlling approximately 70% of MPI.

The main asset of MPI was J. Howard's Koch stock. Upon forming MPI, J. Howard transferred to MPI his Koch stockholdings. Although he hoped that MPI would become an active oil and gas company in its own right, and indeed for some time it was involved in various oil and gas deals, its only real purpose by the time J. Howard died was as a holding company for Koch stock. Through the veil of a corporation, J. Howard sought to protect his Koch stock, and pass it on to Pierce while avoiding as much estate tax consequences as possible.

The evidence reflects the number of Koch shares that MPI held. The Texas Commerce Bank required collateral for a line of credit for MPI. The presentations to the Texas Commerce Bank Loan and Discount Committee, which were made while J. Howard was alive, state that J. Howard, through MPI, owned 862,535 shares of Koch stock. (Ex. 685.) The same documents indicate that MPI had pledged 505,885 shares to Texas Commerce Bank as collateral. Koch issued and had outstanding 5,850,908 shares of common stock. The 1995 Presentation lists J. Howard's percentage ownership as 14.7% based on his ownership of 862,535 shares of the 5,850,908 shares of Koch common stock as of December 31, 1994. (Ex. 685.)

The 1995 and 1996 Credit Approval Presentations state that "the bank does not receive financial statements on Marshall Petroleum and thus the dividend income that MPI receives from Koch stock is relied upon for repayment of bank debt. The Company [MPI] received dividend income of $8MM and $7MM in 1995 and 1994, respectively." The report notes that as a privately held company, access to Koch's audited financial statement is limited and that historically the bank received updates of Koch's financial performance from Pierce. (Exs.684, 685.)

### F. J. Howard's Affair with Lady Walker

In 1982, J. Howard met "Lady" Diane Walker. Feeling the need for a drink after a day at the office, he went to a "strip joint, a titty bar" as he described it in his videotaped deposition in 1992. (Ex. 3225.) Lady Walker was one of the strippers who took everything off for J. Howard in return for his generous dollar bills. Thus, at the age of seventy-eight, he began his pursuit of Lady Walker.

J. Howard wanted Lady Walker to be his exclusive mistress and he often professed his desire and commitment to marry her if Betty died. Money was immediately bestowed upon her. The intensity of his pursuit is set forth in his letters to her.

These letters contain repetitive and aggressive protestations of his love, always coupled with a reference to money.[7] "Jungle Money" and "Pin" are code words for money that J. Howard gave to Lady Walker. "Pin" was a regular payment made on a consistent and timely basis,[8] "Jungle money" was a payment for her own pleasure,[9] and "big kills" were larger sums given sporadically to Lady Walker.[10] J. Howard also gave Lady Walker enormous amounts of jewelry, including more than $1 million purchased from Harry Winston and Nieman Marcus, the same stores at which he would subsequently buy jewelry for Vickie.

At one point, J. Howard sent Lady Walker the Koch Industries prospectus in an apparent attempt to impress her with his wealth. The front of the first page reads, "For Lady—/The Crown jewels/ J. Howard." (Ex. 630.)

This pattern of giving money, and even the terms that J. Howard used, is the same pattern that Vickie describes of J. Howard's pursuit of her a decade later. Lavish jewelry, regular payments of money, and sporadic gifts ushered these bar dancers into J. Howard's life. Apparently, it was extremely lucrative to have an affair

---

7. "Light of my life/ ... Now, as always you can count on/my love and devotion—our 'Jun'/money is but a small sample of my concern for my lady—..." (Ex. 630, p. HBOM 0015501.)

"... my proposal to beg you to be my mistress." (Ex. 630, p. HBOM 0015502.)

"Dear Lady—/I fear I am a nuisance—I still hope I am a beloved nuisance—of course/I shall do what you ask 'stop calling' ... it is part of the juice of my devotion ... All of this is a far, far cry from the years gone by ... you said I could 'call you/whenever I wanted.' I fear I have abused it. If so, it is only because I love you ..." (Ex. 630, p. HBOM 0015505.)

8. "Dear Lady—/Perhaps true love never/runs smooth—but since I love you truly, this 'pin'/ tries to tell you I am/Your devoted man" (Ex. 630, p. HBOM, 0015479.)

9. "Lady love: /Jungle & Pin" (Ex. 630, p. HBOM 0015481.)

"My Lady Love—/Increased Jungle Money —/+/Pin/+/Sharom" (Ex. 630, p. HBOM 0015483.)

10. "Another 'pin' to go with/Big Kill" (Ex. 630, p. HBOM 0015486, H–108–1480.)

with J. Howard. J. Howard spent approximately $2 million a year on Lady Walker, which is approximately the same amount of money he spent each year on Vickie when he pursued her a decade later.

J. Howard's statement that "men in love do stupid things and I was sure guilty" is accurate. (Ex. 3225.) In J. Howard's case, it was a consistent pattern.

### G. The Death of Betty Marshall and Lady Walker and the Beginning of the Lady Walker Litigation

J. Howard's affair with Lady Walker continued uninterrupted until she died suddenly as a result of complications from facelift surgery on July 9, 1991 at the age of fifty-one. The effect of her death on J. Howard was initially described by him as the most tragic thing that ever happened to him. Ironically, shortly after Lady Walker's death, J. Howard discovered that she had betrayed their relationship and had been living with another, much younger, man during most of their affair. Outrage drove J. Howard to sue her estate in January 1992 seeking the return of almost $15,000,000 in gifts that J. Howard had given Lady Walker (the Walker Litigation). J. Howard accused Lady Walker of fraud, claiming she received kickbacks from merchants after the items were purchased and the merchants had charged J. Howard's account. Because J. Howard hated lawyers and disliked handling details, he appointed Pierce to deal with the details of the matter.

### H. IRS Gift Tax Audits

In 1989, J. Howard's gifts to Lady Walker came to the attention of J. Howard's attorney Harvey Sorensen. Sorensen, a tax specialist, became concerned. J. Howard had never filed gift tax returns on the gifts, nor had he indicated any particular concern with doing so. J. Howard's position with respect to the gift taxes was largely similar to his position with estate taxes—he did not want to pay them and it was his lawyers' job to figure out how to avoid them.

Sorensen, however, understood that the gifts were subject to a gift tax that had gone unpaid, and knew that this avoidance of the tax laws would cause substantial interest and penalties from the Internal Revenue Service. Sorensen eventually determined that between $12 and $14 million was given to Lady Walker without taxes being paid. In 1989, he filed amended tax returns for the years 1983–87. These eventually caused the IRS to audit J. Howard and initiate tax collection proceedings.

J. Howard repeatedly attempted to avoid taxes, and during the gift tax litigation, it was discovered that he had, in fact, found a way to use his affair with Lady Walker to his advantage. In the gift tax litigation, J. Howard took the unlikely position that his "pin" payments to Lady Walker were consulting fees. At one point, he suggested that she received a salary of $1 million per year to handle his public relation work. He not only tried to escape gift taxes this way, but it is likely that he deducted his payments to Lady Walker from his income tax returns.

His efforts to hide gifts in the guise of legitimate business operations were disclosed in the testimony of his closest advisors. Jeff Townsend testified that Finley Hilliard, J. Howard's accountant, told Townsend that J. Howard wanted to funnel funds to Lady Walker. Two corporations were formed, in part as a way for J. Howard to give Lady Walker money. Stock of Coliseum, Inc. was held in trust for her benefit and he gave her gifts of Presidio, Inc. stock. Lady Walker also served on the MPI Board of Directors. When questioned about her functions, he replied, "I guess she was a Director—

never active—she never undertook anything as a Director." (Ex. 3225.)

In 1993, Sorensen was relieved of his responsibilities of representing J. Howard, after more than ten years of service. Pierce contends that the reason Sorensen was terminated was because he was not aggressive enough in the disputes with the IRS. However, this contradicts the characterization of J. Howard being fiercely loyal to his employees, who were in turn loyal to him. Sorensen was eventually replaced as J. Howard's lead tax counsel and estate planning lawyer by Edwin Hunter, whose approach to tax litigation was far more aggressive, and whose actions on behalf of Pierce Marshall have become the focal point of the present case.

J. Howard, his family, estate, and MPI became mired in numerous disputes with the IRS. Once again, J. Howard would call on Pierce to handle the details of the litigation. These disputes focused on two critical issues: (1) gifts given by J. Howard to his paramours and (2) the valuation of MPI, and therefore Koch, stock. Once again, the legion of lawyers working on behalf of J. Howard, his estate, and later Pierce, were faced with the quandary of the defending the valuation of MPI and Koch stock.[11]

Reducing the value of Koch and MPI stock had become the central organizing principle of J. Howard's legal team. There was no other goal. They sought to make J. Howard, who was considered one of the 400 richest men in the world and the wealthiest in the state of Texas, appear to be holding as his primary asset a minority interest in a company that had very little market value, despite being one of the largest and most successful oil conglomerates in the country. Failure to do so would cost J. Howard millions of dollars in disputes with the IRS.

Koch valuation was just as important to Pierce, who personally owned Koch voting stock, making him a party to the Koch valuation litigation. He also stood to inherit J. Howard's Koch interest and the valuation problems inherent in these tax disputes with the IRS.

## I. Summary

It is fair to say that J. Howard was an immensely successful businessman. He served on boards of numerous corporations and banks and became involved with a number of oil and gas ventures in Texas. J. Howard was also heavily involved in Koch Industries, as described herein. J. Howard's success earned him a ranking in Forbes Magazine as one of the 400 wealthiest men in America, and the wealthiest man in Texas. But the rating rankled J. Howard, and he claimed to dislike the publicity that it brought. What worried J. Howard more than publicity was the spotlight that it shined on his wealth. Being named as one of the richest men in the country was likely to attract the attention of the IRS.

J. Howard was a well-trained lawyer. Oddly, however, he did not appear to have much regard for the profession. He was reputed to dislike lawyers and the details of lawyering. To his mind, a legal document should never be more than one page long.[12]

---

11. Disputes over gift tax and inheritance tax liability between J. Howard's estate and the IRS are still pending, and the IRS has agreed to keep a settlement offer open until this Court's proceedings are completed. The IRS may want to take a closer look at the summaries written on J. Howard's personal account, and passed on to his accountant, for illegitimate tax deductions.

12. It is ironic then that his death has created the largest volume of legal filings in the histo-

J. Howard is also described as being irascible and demanding. Perhaps to those who knew him, those personality traits were endearing. To outsiders, he was viewed simply as impatient and hostile. His tendency to bang the table to make his point was viewed as being in command of a situation. However, the Court's view is that, at least late in his life, J. Howard's theatrics were transparent.

In addition, J. Howard's disregard for the tax codes was a pattern he followed his entire life. For ninety years, he showed nothing but contempt for the IRS and the tax codes of this country. Throughout his life he surrounded himself with excellent legal counsel who were creative in attempting to circumvent the tax codes.[13] He ignored gift taxes until he could no longer evade the issue. He railed against the inheritance tax provisions, claiming that being forced to pay estate and income taxes was "double taxation," while at the same time he avoided paying substantial income taxes by: writing off as business expenses the gifts to his paramours Lady Walker and Vickie, whom he claimed were consultants; financing his lifestyle by taking a line of credit against his valuable stock holdings, the proceeds of which are not taxable income; and hiding and manipulating his assets in aggressive accounting gimmicks.

In summary, this court is not impressed with the character of a man who had the finest private school and legal education and who consciously avoided the very taxes that millions of American families comply with every year. It is in the collection of these taxes that the government must rely on the good faith and honesty of our citizens to fund our nation's needs in time of peace and war. The fact that J. Howard could not see fit to comply with these laws, despite the great advantages that he was afforded by American society, speaks poorly of his character.

## II. VICKIE LYNN MARSHALL

Vickie dreamed of becoming the personification of her idol, Marilyn Monroe. Both became international superstars, traveling far from home under assumed names. Norma Jean's fame thrust her into the arms of an American baseball icon and a dashing young politician, while Vickie Lynn found herself in the company of a Texas oil baron. But her notoriety never reached the same heights or longevity. Her life is best described as that of a person who was rescued by her wealthy pursuer and taught to spend money at a breathtaking pace that most Americans cannot fathom. While she detested being thought of as a gold-digger, her actions leave little doubt that money was the central facet of her relationship with J. Howard. Her appetite for money, once developed, was incessant and outlandish by everyday standards.

Vickie appeared before the Court to testify for three days. Her communication skills were poor as she frequently had trouble engaging counsel. Her illiteracy is striking. Examples are too numerous to chronicle but include writing "25.00" meaning $2,500 and "4500,00" meaning $4,500— she testified that she has trouble with zeros. In fact, she has only recently started learning to pay her own bills after years of managers and relatives managing her money. Vickie also finds herself in

---

ry of the Southern Division of Central District of California.

**13.** Surprisingly, much what J. Howard managed to do was within the confines of the law, allowing him to evade taxes by stepping through loopholes that only someone of his great wealth could afford to find.

difficult times and is being treated for depression.

But education is no guarantor of integrity and a discredited profession does not mean a person lacks truthfulness. While Vickie certainly drew a more noble image of herself than the facts bear out, her testimony on the statements made by J. Howard are credible.

### A. Background

Vickie Lynn Marshall was born in Houston, Texas in 1967. Her parents divorced shortly after she was born and her father moved away. She never saw him until she looked him up after she had become Playmate of the Year. In her teens she moved with her mother to Mexia, Texas, a small town in the eastern part of the state. She completed grade school, but failed her freshman year in high school, and never progressed past an eighth grade education.

Vickie worked as a waitress and morning cook at Krispy Fried Chicken in Mexia where she met Billy Wade Smith, who was the cook at the restaurant. At the age of 17, she married Billy Smith, and at the age of 19, she gave birth to her son Daniel, her only child. The marriage ended shortly thereafter, and Vickie moved back to Houston with Daniel when he was a year old.

### B. Career as a Dancer

At this point in her life, Vickie was estranged from her family. Her husband, Billy Wade Smith was not providing child support and made no effort to visit Daniel. Initially she found employment at Walmart and later as a waitress at the Red Lobster, but she could not make enough money to support herself and Daniel. Vickie testified that one day, while on the way home from work, she passed a neon sign that displayed a lady in high heels wearing a bikini. She was interested in becoming a dancer, but deferred at first when she found out it was a nude dance bar. She initially sought a job as a waitress but was quickly talked into dancing on stage. After a couple of drinks, humiliated but willing to dance, she overcame her inhibitions and continued as a dancer when she saw "all the money in her lap which paid the bills."

Vickie, however, was big-boned, and in the fashion trends of the late 1980's and early 1990's, her figure relegated her to the "B" team. Instead of working the lucrative night shifts, Vickie danced during the day, for less pay and fewer tips. But this apparent disadvantage would soon work in her favor.

## III. J. HOWARD'S AND VICKIE'S TIME TOGETHER

J. Howard and Vickie began their relationship in October 1991, when they met at Gigi's in Houston, Texas. They married June 27, 1994 and their relationship continued until his death on August 4, 1995. They met when she was at the vibrant age of twenty-four, and he a sickly eighty–six year–old man. The issues of J. Howard's donative intent and Vickie's expectancy can only be understood by slowly unwinding their years together.

### A. The Meeting of J. Howard and Vickie

After Lady Walker and Betty died in 1991, J. Howard entered a period of deep despondency. He appeared to his family and friends to have lost his zest for life. In 1991, J. Howard told his eldest son, J. Howard, III, that "he enjoyed having pretty women on his arm when he entered the River Oaks Country Club in Houston and that a great light had gone out of his life."

In October 1991, Vickie was dancing at Gigi's, a Houston strip club. Dan Manning

was J. Howard's driver who frequented Gigi's and had seen Vickie dance. Manning and J. Howard had talked about going to a burlesque bar and in October, Manning drove his boss to Gigi's to cheer him up. Because of J. Howard's age and physical condition, he did not go out at night, and thus they arrived during the day-shift, when Vickie worked. Manning approached Vickie and asked her to dance for J. Howard. According to Vickie, when she saw J. Howard, "he looked terrible, he looked like he had lost his will to live." While Vickie danced, J. Howard tried to grab her breasts. Thus began J. Howard's aggressive pursuit of Vickie's affection. He asked to her to have lunch with him the next day. A description of this lunch helps to understand the pattern that they followed for the years of courtship prior to their marriage.

## B. The Courtship

J. Howard initially took Vickie to a restaurant hotel and ordered room service. He told Vickie about Betty and Lady Walker and funny stories about himself. When she became concerned about her job, he gave her an envelope with a thousand dollars in cash and told her not to go to work. The following day they had lunch at River Oaks Country Club, where once again she was given cash. On each occasion, money was given to her ranging in amounts of $1,000 to $5,000 in cash. Vickie "stopped dancing right after Howard met me that day." (Dep. of Vickie, Dec. 28, 1999, vol. 3, p. 600.) J. Howard was soon paying all of Vickie's bills. Shortly after they met, J. Howard purchased a white Toyota Celica as a gift for her after her own car had been repossessed.

She started receiving $2,000 checks twice a month. (Ex. 48.) These checks were recorded by J. Howard's assistant Eyvonne Scurlock for consulting, just as his previous "pins" to Lady Walker had been. Summaries prepared by Scurlock were then sent to J. Howard's accountant for tax purposes and 1099 Tax forms for Vickie were prepared. (AP 11462, Dep. of Eyvonne Scurlock, August 27, 1999. pp. 72, 576–577.) These $2,000 checks increased over time to $2,750.

Within a week of their meeting, J. Howard told Vickie that he was going to marry her. He had been re-invigorated by Vickie. While he had fallen into a state of deep despair after the deaths of Lady Walker and Betty, his relationship with Vickie brought him back to life. He called her "the light of his life." He told his attorney Harvey Sorensen numerous times that he wanted to marry Vickie.

According to Vickie, J. Howard asked her to marry him "tons of times." She contends that the proposals were usually accompanied by the same assurance that once they were married, she would have half of everything he had. His proposals occurred frequently, and are confirmed by numerous friends, employees and professional associates. He started buying her rings that increased in size and value. When he gave her rings, there was always the same conversation about marriage. "It seemed like every time he would buy me a bigger and bigger ring and he would ask me over and over and over and he was very pushy. He really loved me. He just really wanted to marry me." (Dep. of Vickie, December 28, 1999, p. 642.) During J. Howard's courtship of Vickie, he purchased at least three large engagement rings as well as numerous smaller rings. On each occasion, the giving of these rings was accompanied by the same incessant matrimonial proposals.

J. Howard's aggressive pursuit is illustrated by one instance where he purchased jewelry for Vickie from Nieman Marcus. On Christmas Eve 1993, David Watson, a

Nieman Marcus employee, delivered various pieces of jewelry to Vickie's home for her and J. Howard to review. Vickie looked at all the pieces, and commented that a particular yellow diamond ring was too expensive and should not be shown to J. Howard. When J. Howard arrived, he looked at the jewelry and commented: "this is better than the Home Shopping Network." J. Howard then asked if he had seen everything. Watson, forgetting Vickie's admonition, showed J. Howard the yellow diamond ring. When told that the price was, $107,000, J. Howard stated: "Oh, just a baquetta." J. Howard then completed the purchase. That purchase, and an earlier one by J. Howard in April 1993, were the two largest purchases in store history.

During their courtship, J. Howard made numerous other gifts to Vickie. On September 16, 1992, J. Howard purchased a ranch for Vickie in Tomball, Texas, outside of Houston (the Tomball Ranch). This ranch was purchased in the name of the J. Howard Marshall, II, Living Trust (the Living Trust), but was intended for Vickie's use and benefit. J. Howard later purchased a home on Rusington Street in Houston, which was held by the Houston Land Trust, with her as the beneficiary. J. Howard also rented the Los Angeles house that Marilyn Monroe had lived in. When the lease expired, he purchased a house on Ashdale street in the Brentwood area of Los Angeles for her. J. Howard also provided Vickie with an apartment in New York City when she spent time there. He bought her $10,000 gowns that could only be worn once because in "Hollywood you could never wear the same dress twice." Jewelry purchases from Harry Winston jewelers for Vickie exceeded $2 million. In 1992, J. Howard purchased a new Mercedes Benz for Vickie.

Vickie testified that J. Howard taught her to spend money, and that spending money was fun. She was the second of two women with little wealth and no experience whom J. Howard taught that there were no limits to the fun of spending money if they were with him.

J. Howard eventually introduced Vickie to Pierce. On one occasion in 1992, J. Howard took Vickie and Pierce to lunch at the Royal Oaks Country Club. From the outset, the relationship between Vickie and Pierce was tense. Vickie already believed that Pierce did not like her, and felt that during the entire lunch he was giving her "mean looks." According to Vickie, when J. Howard went to the restroom, Pierce told her "don't let J. Howard buy you anything else."

J. Howard nevertheless repeatedly proposed to Vickie. She had just started taking voice and modeling lessons when she met J. Howard, and although she was flattered by these proposals, she wanted to have a career first. Vickie put off J. Howard almost three years before she finally accepted his proposals.

Shortly after they met, Vickie saw an ad in the newspaper to audition for *Playboy Magazine*. After meeting with a scout, Vickie was quickly hired and two weeks later was doing a test shoot in California. In March 1992, Vickie made her *Playboy* debut, appearing on the cover. In May 1992, she was named *Playboy* Playmate of the Month.

Vickie was contacted by Guess Jeans to be part of its national advertising campaign. She became their top spokes-model for a one-year period from 1993–94. During this time, she appeared in numerous other magazines and in 1993 was named the *Playboy* Playmate of the Year. Vickie had achieved the level of international sex symbol, and was one of the most recognized print models in the world. Her star-

dom only encouraged J. Howard to pursue her with a newfound vigor.

In Spring 1994, Vickie was on tour for Guess Jeans in Singapore. While there, she and the Guess Jeans entourage were mobbed by fans. The incident scared her, and the remainder of the tour stops in Japan and the Philippines were cancelled. When she returned home to Houston, J. Howard once again proposed to her. J. Howard repeated that she was the woman who had saved his life, that he would take care of her and her son, and that she would have half of everything he had. This time, Vickie accepted.

Vickie testified that his money was a factor in her decision to marry J. Howard, but contends that she would have married him anyway. Vickie sought security for her and her son, and what he might lack in youth, vigor, and looks, J. Howard made up for with his great wealth. Although she has often been portrayed to the Court as a gold-digger and predator, she did hold a certain regard for J. Howard, and was willing to compromise her prime modeling years for someone who showered her with gifts and offered financial security.

### C. The Marriage of J. Howard and Vickie

J. Howard and Vickie were married on June 27, 1994 at the White Dove Wedding Chapel in Houston, Texas. Although numerous prenuptial agreements had been prepared, beginning as early as 1992, none were signed, nor was any such agreement ever discussed with Vickie.

The wedding was not widely announced, and Pierce did not learn of the wedding until after it occurred. Only a few close confidantes attended, including J. Howard's assistant Eyvonne Scurlock, his new driver Arnold Wyche, his nurse Charlotte Fade, and Vickie's aunt and uncle, Elaine and Melvin Tabers. Henry Schlesinger, one of the MPI executives was invited, but did not attend.

The night of the marriage, Vickie flew to New York on an assignment, leaving J. Howard in Texas. On July 6, 1994, J. Howard left for California to visit his new wife.

During their marriage, J. Howard continued to give extravagant gifts to Vickie. J. Howard also considered adopting Vickie's son Daniel. One of J. Howard's lawyers, Jeff Townsend began seriously investigating the issue. He contacted counsel in California about possible adoption proceedings and traveled to California to meet with attorney Lawrence Leone. (Ex. 143.) The adoption, however, never took place because Townsend determined that he would not be able to obtain consent from Daniel's natural father, Billy Wade Smith. The steps taken to begin an adoption proceeding demonstrate that J. Howard was prepared to undertake a greater commitment to Vickie and her son, not only during his lifetime, but long afterward.

Vickie and J. Howard also tried to have children of their own. Initially, they tried to have children in what Vickie described as "the normal way." When that did not work, J. Howard went to a fertility doctor to seek advice and treatment.

### D. Post-nuptial estate planning changes

After J. Howard and Vickie were married, J. Howard's estate plan changed. Although his will was not changed at that time, the Living Trust was amended to become irrevocable. His interest in MPI was reduced until, by summer of 1995, he was stripped of all of his ownership interest in the company. These changes were made by a series of documents that are the

heart of the claims of tortious interference, *infra.*[14]

### E. Illness and Death of J. Howard

J. Howard traveled to Los Angeles in December 1994 to spend Christmas and New Year's with Vickie and Daniel. He and Vickie had, until that time, kept their relationship out of the public spotlight. They planned to make their relationship public at the New Year's Eve party at the *Playboy* Mansion in Beverly Hills.

J. Howard was overjoyed. His joy at being with Vickie is demonstrated by pictures of him with Vickie that Christmas. (Ex. 264.) Although Vickie appeared to have a pleasant Christmas Day, she spent most of the rest of the time J. Howard was visiting hidden away in her separate bedroom.

After Christmas, J. Howard fell ill and returned to Houston, where he planned on picking up his tuxedo and seeing his doctor before returning to Los Angeles in time to attend the New Year's Eve party with Vickie. However, J. Howard's illness turned out to be pneumonia and he was hospitalized at the Park Plaza Hospital on January 1, 1995.

J. Howard returned home after his release from the hospital on January 13, 1995 but he never regained his good health. On January 23, 1995, Vickie returned to Houston from Los Angeles and found J. Howard in a deplorable state. She stayed up with him that night, and she

and his nurse Charlotte Fade fed him chicken soup. Sometime in the early morning hours, J. Howard choked and his heart stopped. CPR was administered and J. Howard was rushed to the Spring Branch Hospital, where he stayed until February 9, 1995.

After this near-death experience, Vickie's dispute with Pierce began in earnest. Pierce had left instructions that J. Howard was not to be suctioned and Vickie was infuriated. She believed that Pierce had decided to let his father die. During J. Howard's stay in the hospital, Pierce refused to pay for her bills or give her any additional money. On February 4, 1995, Vickie went to Spring Branch Hospital at 2 a.m. to visit J. Howard. She brought along a friend of hers, Raymond Martino, a Hollywood producer. Martino videotaped Vickie and J. Howard together, presumably so that Vickie could use the tape in court—either of law or of public opinion. On another occasion, Vickie brought a tape recorder and sought to tape J. Howard. She climbed into his bed, exposed her breasts and asked J. Howard: "Do you miss your rosebuds?" (Testimony of Letisha Hunt, Tr. of Tex. Probate Trial, Feb. 21, 2001, pp. 18–19.)

During this time, it was clear that J. Howard was dying. His attorney Jeff Townsend began making funeral arrangements and trying to determine who would take charge of J. Howard's body. (Ex. 650, p. 21929.)[15] On February 22, 1995, J.

---

**14.** The primary documents that changed J. Howard's estate plan are, *inter alia:* the Grantor Retained Annuity Trust (GRAT) of August 1993; the sale of MPI stock to Pierce in exchange for a promissory note in August 1993 (the Pierce Note); the Amended and Restated Living Trust of July 13, 1994; the Assignment of the Pierce Note, purportedly dated June 1, 1994; the Promissory Note between J. Howard and MPI, purportedly dated June 1, 1994; the Pledge of Pierce Note to

MPI, purportedly dated June 1, 1994; the Renunciation of Income Distribution from the Living Trust; the Donation of the GRAT to the Living Trust; and the Sale for Private Annuity of MPI stock.

**15.** Townsend's research proved prescient. The odiousness of the parties involved in this case was displayed when Pierce sought to have J. Howard cremated, while Vickie insisted he be buried in California. The Texas

Howard again returned to Park Plaza Hospital, where he stayed until March 30, 1995. While there, J. Howard underwent gall bladder surgery. In the Spring of 1995, unbeknownst to Vickie, J. Howard was diagnosed with inoperable, terminal stomach cancer.

As his health deteriorated, the dispute between Vickie and Pierce intensified. Pierce believed that Vickie's bills were excessive and directed that all of Vickie's creditors contact her directly. He stopped paying for her expenses. Vickie sued in state court in Harris County, Texas for spousal support.[16] That litigation was soon followed by guardianship proceedings, where Vickie and Pierce both sought to be appointed guardian of the person of the ailing J. Howard. When J. Howard returned home, Pierce hired off-duty Houston police officers to guard J. Howard at his home. Although Pierce testified that these guards were hired only to insure J. Howard's safety, they appeared in situations where there was no danger of harm. Vickie was not allowed to visit J. Howard without the guards being present. Glenn Johnson, who the Texas probate court had appointed temporary guardian ad litem for J. Howard, testified that he too was not allowed to visit J. Howard without the presence of the guards. Johnson testified that the guards were intimidating and opined that they had been hired to prevent Vickie from visiting J. Howard. He believed that Vickie, who was in Houston frequently during June and July of 1995, wanted to see J. Howard more often, but would not go to J. Howard's home because of the guards. Pierce had reason to keep Vickie from seeing J. Howard, because, as detailed, *infra*, he

was concerned that she might be able to get him to sign a new will or gift instrument.

Nevertheless, from April through July, Vickie visited or telephoned J. Howard on a nearly daily basis. Vickie's visits decreased in July 1995, when she spent some time in the hospital herself. On August 4, 1995, J. Howard died at the age of 90. He was survived by his two sons, his wife, and an unprecedented volume of litigation.

In sum, their lives were intertwined in need, driven by greed and lust. Nevertheless, the Court is convinced of his love for her. J. Howard referred to Vickie as the "light of my life," and the lady that saved his life. His relationship with her provided the happiest moments of his last few years. He considered Vickie his reason for living, and the joy that she brought him undoubtedly helped him live another four years. There is no question that he showered her with gifts, that he sought to protect her and provide for her.

The Court is more cautious about her love for him. J. Howard became Vickie's knight in shining armor. His help propelled her to the highest levels of stardom, something unimaginable for a girl from her background. She cherished the protection and security that he afforded her and the lavish gifts that he gave to her in order to win her affection. J. Howard used his money to get Vickie to fall in love with him, and in her own way, Vickie loved J. Howard.

## IV. TORTIOUS INTERFERENCE

### A. J. Howard's Donative Intent

Upon meeting Vickie, J. Howard immediately began bestowing numerous gifts

---

probate judge, seeking the wisdom of Solomon, ordered that the ashes be divided between Pierce and Vickie. *See* 1 Kings 3:16–28 (King James). Pierce and Vickie each took their half of J. Howard's remains.

**16.** During this time period, Vickie had hundreds of thousands of dollars in her checking account.

upon her. As detailed *supra*, J. Howard gave Vickie millions of dollars worth of gifts in the form of cash, property, cars, and jewelry. Besides these gifts, however, the evidence demonstrates that J. Howard intended to give Vickie a gift that would provide for her once her modeling career was over and he had passed on.

In the fall of 1992, J. Howard's estate planning lawyer Harvey Sorensen began preparing for J. Howard's goal of wedding Vickie. At J. Howard's direction, he drafted a pre-nuptial agreement for J. Howard and Vickie. This agreement was presented to J. Howard on November 18, 1992. The draft pre-nuptial agreement was 58 pages. (Ex. 3242.) The draft agreement provided that Vickie would receive certain amounts of money upon the termination of the marriage by either death or divorce. Vickie was to receive $100,000 for each month that J. Howard and Vickie were married. Vickie was also to get an additional $5 million if she and J. Howard had a child together. Largely as a result of J. Howard's lingering bitterness from Lady Walker's betrayal, J. Howard insisted that the draft agreement include a provision that if Vickie had intercourse with anyone other than J. Howard during their marriage, that her payment would be reduced by half. (Ex. 3342.)

J. Howard believed the draft agreement was too long. He insisted that legal documents be only one or two pages and he directed Sorensen to revise the agreement. But from this time forward, J. Howard adhered to his plan to make a substantial gift to Vickie. One of his last recorded statements is a tape recorded message to the Texas probate judge on May 26, 1995, where he states: "I want my wife [Vickie] to be supported by me." (Ex. 364.)

During this same time period, J. Howard turned to attorneys Edwin Hunter and Jeff Townsend, both of Lake Charles, Louisiana. He gave Hunter the draft pre-nuptial agreement that Sorensen had prepared and asked Hunter to prepare a new pre-nuptial agreement that was not so long. At this point, he set Townsend and Hunter to work on a parallel path as Sorensen.

At the same time, J. Howard was seeking other avenues to give gifts to Vickie. J. Howard directed Townsend and Hunter to prepare documents for a "Marshall Farms" corporation to run the Tomball Ranch that he had purchased for Vickie. (Ex. 58.) Additionally, he asked Hunter and Townsend to prepare documents for a "corporation for Vicky's [sic] business." (Ex. 58.) Through this, J. Howard intended to buy Vickie numerous gifts of clothing and jewelry that would help her develop her career and image in Hollywood. In order to make the corporation not appear to be a sham to the IRS, Vickie would sign an agreement for the corporation to have rights to exploit her celebrity image through goods such as perfume and clothing, in exchange for salary from the corporation, another gift to Vickie. Vickie was to eventually receive the proceeds from these goods.

Finally, J. Howard directed Hunter and Townsend to draft a "catch-all" trust for Vickie. (Ex. 58.) As described, *infra*, this draft trust instrument was never produced to the Court. However, the circumstances under which it was drafted lead the Court to the inescapable conclusion that the "catch-all" trust was intended to be a document whereby J. Howard would transfer assets to Vickie, to be held in trust for her until after his death.[17]

---

17. The Court finds that the evidence before the Court sufficiently establishes the existence

of a draft "catch-all" trust instrument prepared by Edwin Hunter. However, if the

On December 14, 1992, J. Howard and Townsend spoke about the plans for Vickie. Townsend primarily specialized in gas and oil leases, but was a confidant to J. Howard, and fulfilled many roles. The next day, he sent a letter to his colleague Hunter. It memorialized his conversation, and asked for a progress report. (Ex. 58.) It detailed the four things that J. Howard wanted done: a pre-nuptial agreement, the Marshall Farm corporation, the corporation for Vickie's business, and a "catch all trust." (Ex. 58.) Townsend's letter was a reminder to Hunter to get to work.

On December 22, 1992, J. Howard met with Pierce, Hunter, Townsend, and Sorensen to review these matters related to Vickie, as well as other pieces of ongoing litigation. (Ex. 3245.) Sorensen's handwritten agenda included four specific "VLS Proposals": a "Family Farm Corporation," a "Modeling Corporation," a Grantor Retained Income Trust, or "GRIT," and adoption.[18] (Ex. 3245.) The agenda also included the pre-nuptial agreement as a separate agenda item. (Ex. 3245.) Unsatisfied with the results his attorneys had produced up until that time, J. Howard turned back to Sorensen.

J. Howard again told Sorensen that he wanted to marry Vickie. He told Sorensen that he wanted to provide Vickie with half of his "new community." (Ex. 62.) Sorensen testified that:

> new community was Mr. Marshall's words. He obviously intended to make her a gift. Well it's important to him because he wanted to share with her something he had done ... "I am going

to make this Koch Industries greatly enhanced in value and I want her to share in my achievements."

(Tr. of Tex. Probate Trial, Nov. 2, 2000, p. 181.)

Consistent with his propensity to avoid taxes, J. Howard did not want to trigger any gift tax liability, but wanted the gift to be "legally enforceable." (Id.) J. Howard defined for Sorensen what he meant by "new community," a term that he had previously employed when married to Betty. (Id.) As he had done with Betty, J. Howard defined "new community" as the growth of all his assets, even if they were separate property, during the time he was married to Vickie.

In discussions with Sorensen, the two concluded that his principal asset was his interest in MPI, and therefore Koch Industries. (Ex. 62.) J. Howard believed that the growth in Koch Industries would come from its recent acquisition of the United Pipeline System, which he believed he had been instrumental in bringing about. (Id.) Although he did not plan to give her Koch stock outright, J. Howard was particularly interested in sharing with Vickie the fruits of that labor in the growth of the value of Koch stock.

J. Howard also made clear at that time that he wanted Vickie to have the benefit of the gift after he had passed away. J. Howard was aware that Vickie's career had a short life cycle. Although he could provide for her during his lifetime, he wanted her to have financial security and a comfortable retirement. J. Howard knew

---

evidence had not been sufficient, the discovery abuses in this case might have led the Court to deem this fact as established as a sanction. *See* Fed.R.Civ.P. 37(b)(2)(A); Minute Order of October 5, 2001 Re: Evidentiary Sanctions.

**18.** This was not J. Howard's plan to adopt Vickie's son, which came about later. Instead, at the time, J. Howard was considering adopting Vickie, so as to avoid the generation skipping tax. Sorensen pointed out to him that Texas law might frown on the type of relationship he was having with his new "daughter."

that Vickie had limited intelligence and experience. He would later call her "unteachable." Accordingly, he believed that some form of trust would be appropriate to provide for her after his death.

On his flight to Kansas the next day, Sorensen dictated a memo memorializing his conversation with J. Howard (the New Community Memo). (Ex. 62.) Sorensen and members of his firm researched the possibility of making such a gift to Vickie. Like all of J. Howard's lawyers, they ran into the dual problems of Koch stock valuation and Gift Tax liability. Indeed, because J. Howard was so much older than Vickie, a gift to her would also be subject to the Generation Skipping Tax of 55%. Sorensen eventually determined that the gift could not take place at that time because of the tax liability.

J. Howard's tax concerns, however, were always a short-term problem. He planned to marry Vickie, and once he did there would be no tax liability for the Generation Skipping Tax or the Gift Tax. At one point, Hunter told J. Howard that he would solve all of his gift tax problems related to Vickie if he simply married her. Indeed, when J. Howard first told Hunter of his marriage to Vickie, he told Hunter that he had done so on Hunter's advice.

J. Howard's intent is also demonstrated by his interest in having children with Vickie. As noted *supra*, J. Howard seriously considered adopting Vickie's son Daniel. The adoption did not occur only because it became clear that Daniel's natural father would not give consent to the adoption. Moreover, Vickie and J. Howard attempted to have children of their own. J. Howard's intention to have children with Vickie demonstrates his interest in taking on substantially greater responsibilities toward Vickie and her children. These responsibilities would surely have

included providing for his children's mother after he had passed away.

## B. Vickie's Expectancy

J. Howard repeatedly proposed marriage to Vickie. On at least three specific occasions, J. Howard's proposals included specific promises of gifts to Vickie.

When the Tomball Ranch was purchased in 1992, Vickie was concerned about her right to the property because her name had been crossed out on the deed and she was wary of Pierce. Vickie explicity recalls that J. Howard told her "he wanted to take care of me and my son and give us security and he promised me half of everything that he had, that he wanted to always take care of me and always have me taken care of because of his age and all." (Dep. of Vickie, Dec. 28, 1999, p. 612–622.) Vickie's testimony before this Court was nearly identical on this issue.

Her second explicit recollection of donative intent was the purchase of a new 1993 Mercedes. Vickie wanted to get the title in her name and J. Howard stated, "honey, don't worry about it. Once we are married, you will have half of everything that I have."

The third time J. Howard made an explicit promise to her was when she returned to Houston in June 1994, after having been mobbed in Singapore on her Asian tour. "He just told me—I think he was missing me real bad because I was gone for a full week. And he just—I believe that he missed me really bad and he asked me to please marry him and that he loved me and that I would have half of everything that was his. I would have security for me and my son; and so finally I accepted his proposal." Shortly thereafter, Vickie and J. Howard were married.

No evidence was produced to show that anyone other than Vickie heard these spe-

cific proposals. However, the Court is guided by life experience in making the rather unremarkable finding that most proposals are not trumpeted to the public or made in the presence of the family attorney, especially when the pursued object of matrimony has declined repeated proposals for nearly three years.

The privacy of J. Howard's proposals is corroborated by Harvey Sorensen. In March 1992, Sorensen had dinner with J. Howard at the River Oaks Country Club. At that dinner, Sorensen met Vickie for the first time. When she arrived, J. Howard asked Sorensen to excuse himself while J. Howard and Vickie spoke. While secretly watching the couple, Sorensen saw J. Howard give Vickie a ring and an envelope which Sorensen thought had money in it. J. Howard's promises are also corroborated by his pattern of sharing his "new community" with his second wife Betty and his seeking Sorensen's aid in creating a mechanism to give Vickie one-half of his "new community."

Although Vickie believed that J. Howard promised her one-half of his fortune, the Court finds that J. Howard always intended to give Vickie only half of his "new community." J. Howard, who used his wealth to impress women, did not explain to Vickie that what he meant by "half" referred to the "new community." Such a statement would be far less impressive.[19] Furthermore, such a statement would have meant little to Vickie, who was not familiar with what J. Howard meant by "new community," and would not be capable of grasping the distinction. Vickie therefore accepted J. Howard's promise at face value.

### C. Edwin Hunter's Credibility

Edwin Hunter appeared before the Court to testify from December 12 to December 17, 2001. Hunter is a member of the bars of Louisiana, Texas, and Washington, D.C. He attended Louisiana State University for both undergraduate and law school. He began his legal career by working for a New Orleans firm in 1968. He later moved to Lake Charles where he became the head of the tax and estate planning division, and later the president, of a local firm. Since 1986, Hunter has been practicing in his own firm in Lake Charles, Louisiana, which is currently called Hunter, Blazer & O'Dowd (the Hunter Firm). Hunter represented MPI, J. Howard, and a number of the various trusts, all of which are now controlled by Pierce. Besides estate planning, Hunter's primary work for J. Howard in the years immediately preceding his death related to the on-going tax disputes between J. Howard and the IRS, which included questions on the value of gifts given to Lady Walker and the value of both MPI and Koch Industries.

Hunter was central to J. Howard's estate planning in the years prior to his death. Although Harvey Sorensen had taken over representation of J. Howard's estate planning in the early–1980's, and was responsible for drafting J. Howard's original living trust, Hunter began doing estate planning work for J. Howard in 1992. By mid–1993, Hunter had supplanted Harvey Sorensen as J. Howard's pri-

---

19. The dichotomy of the statements is illustrated by two hypothetical proposals:

"Dear Vickie, please marry me and I will give you one-half of our 'new community,' which is a term I have coined and define as the appreciation of my assets, which primarily consist of Koch Industries stock, which is held by a holding corporation I created called MPI, the shares of stock of which are held in a living trust, which I amend from time to time;" or

"Dear Vickie, please marry me and I will give you half of everything."

mary estate planning counsel. Hunter was responsible for the drafting of a number of J. Howard's final estate planning documents including the Amended and Restated Living Trust of July 13, 1994. The bankruptcy court found that Pierce "conspired with Hunter ..." in tortiously interfering with J. Howard's gift to Vickie. *Marshall* I, 253 B.R. at 554. Obviously Hunter's credibility is therefore of utmost importance in determining the facts of the case.

For the reasons set forth below, the Court finds that Hunter lacks credibility as a witness. First and foremost, Hunter's lack of credibility was consistently demonstrated to the Court by numerous falsehoods made before the Court that were directly contradicted by documentary evidence in the case and, in some instances, by other witnesses on Pierce's side. Second, Hunter has several motives to distort the facts in this case: to cover up his wrongful conduct during the events that give rise to this case; to preserve a settlement offer from the IRS on the value of MPI and Koch Industries in the continuing gift tax litigation, in which he continues to represent the Marshall family interests, now managed by Pierce; and to endear himself to Pierce, who has inherited J. Howard's wealth, whom Hunter admits was one of his largest clients. Finally, Hunter's lack of credibility was demonstrated by dishonest actions and his apparent willingness to abuse the high standing of his close family members.

Hunter's false statements are detailed first. The statements include, but are not limited to the following:

### 1. Hunter's statement that he did not draft a "catch-all trust."

During the proceedings before this Court, Hunter was asked where the draft of the "catch-all" trust was. Hunter claimed that he did not know. At that point in the proceedings, counsel for Vickie argued to the Court that it should sanction Pierce for his discovery abuses by designating as established that such a draft trust existed and would have been a mechanism to make gifts to Vickie. Hunter then stated that he "suddenly remembered" that the "catch-all" trust referred to a voting trust agreement for Compagnie Victoire. Hunter's "sudden" recollection, after six years of litigation in this matter is incredible on its face. Moreover, such a recollection is contradicted by the facts of the case.

On December 15, 1992, Jeff Townsend sent Hunter a letter urging him to finish his work on four documents related to Vickie, all of which were to be presented to J. Howard at a meeting later that month. (Ex. 58.) Those documents were a draft-prenuptial agreement, a family farm corporation, a modeling corporation, and a "catch-all" trust. Hunter's billing records indicate that he and other members of the Hunter Firm worked on the first three documents prior to his meeting with J. Howard on December 22, 1992. (Ex. 649, p. 4.)

Not only do Hunter's billing records show his work on the first three items referenced in Townsend's December 15, 1994 letter, but they also demonstrate that he and members of the Hunter Firm worked on the "catch-all" trust. On November 10, 1992, his partner Glynn Blazier had a "[t]elephone conference with Finley Hilliard and Jeff Townsend regarding proposal to create trust for estate planning purposes." (Ex. 649, p. 2.) Additionally, Hunter's billing records show that he had a telephone conference with Blazier regarding the same. (Ex. 649, p. 2.). Hunter and Blazier again held a conference on a proposed trust on December 16, 1994. (Ex. 649, p. 3.) And finally, Hunter's billing

records show that Glynn Blazier drafted a trust document on December 21, 1994. (Ex. 649, p. 4.)

That work on a "catch-all" trust was undertaken is also corroborated by Sorensen's handwritten agenda for the meeting with J. Howard, where he includes discussion of a GRIT, which was never produced. (Ex. 3245.)

Hunter claims that the term "catch-all" trust was used by Townsend because he was an oil and gas lawyer and thus did not understand the complexities of estate planning.[20] Townsend, however, as a corporate lawyer, would have been well aware of a voting trust and how it works, and would not mistakenly have referred to it as a "catch-all" trust.

Hunter further testified that the voting trust for Compagnie Victoire was necessary because Vickie was worried that she would not control the company because J. Howard owned all the stock. Thus, according to Hunter, a voting trust would assure her that she would control the company. Documents in evidence, however, show that Compagnie Victoire was not created until 1993 and that Vickie did not know of its existence until after its creation. Thus, Hunter could not have been preparing a document to ease Vickie's concerns about control of a corporation that she had no idea existed at the time. Moreover, the evidence shows that the voting trust for Compagnie Victoire was not

put into place until several months later. Furthermore, the Court is quite confident that, based upon her limited intelligence and understanding of business affairs, Vickie would not understand the workings of a voting trust. Hunter later claimed that the "catch-all" trust was subsumed into Compagnie Victoire.

Unfortunately, the Court must conclude that Hunter was untruthful. A draft "catch-all" trust was prepared, or, at the least, J. Howard directed Hunter to prepare one.

### 2. Hunter's statement that he did not know when the Fine Tuning Memo (Ex. 310a) was originally drafted.

In fact, Hunter knew full well that the Fine Tuning Memo was drafted on July 8, 1994. Hunter's billing records indicate that he drafted "Marshall post-matrimonial plan" on July 8, 1994. That corresponds with a statement in the Fine Tuning Memo that J. Howard had not told his children of his marriage to Vickie as of July 8, 1994. (Ex. 310a, p. 1.)

In the bankruptcy court, Hunter claimed that the "Marshall post-matrimonial plan" referred to in the billing records was the Amended and Restated Living Trust instrument dated July 13, 1994. (T2247.)[21] That was demonstrated to be false because Hunter's billing records indicate that Cherry Doucet drafted the Amended Living Trust on July 11, 1994, after receiving

---

**20.** Townsend did, however, carry out several personal, estate related, legal services for J. Howard, including investigating the possibility of adopting Vickie's son.

**21.** As a result of this perjured testimony, there are portions of the bankruptcy court's proposed findings of fact and conclusions of law which mistakenly refer to the Amended and Restated Living Trust as the Fine Tuning Instrument. Pierce's Amended Assignments of Error often quibble with the bankruptcy

court's findings on the matter. (See, e.g., Am. Assignments of Error ¶ 25: "There is no evidence that J. Howard ever saw or was informed of the contents of the Fine Tuning Document."; Am. Assignments of Error ¶ 27: "The Fine Tuning Document does not purport to change the provisions of the Living Trust...."; see also, e.g., Am. Assignments of Error ¶ 26, 28.) These contentions are the height of bad faith. See Fed.R.Civ.P. 11(b)(2), 11(b)(4).

instructions from Hunter. (Ex. 649, p. 103).

This is important because it shows that the July 13, 1994 Amended and Restated Living Trust was changed to comport with the goals set forth in the Fine Tuning Memo which was drafted July 8, 1994, and therefore the Court can gain insight into the changes to the Living Trust by reference to the Fine Tuning Memo.

### 3. Hunter's statement that the reference "mischief" in the Fine Tuning Memo did not refer to gifts for Vickie.

Hunter's Fine Tuning Memo states that his plans would leave "less for mischief (and Miss Cleavage)." (Ex. 310a, p. 12.) Although Hunter admitted that "Miss Cleavage" referred to Vickie, he denied that "less for mischief" referred to allowing J. Howard to have less money that he could give to Vickie. Instead, Hunter disingenuously claimed that the phrase meant less for unspecified "waste." This deception was intended to hide what Hunter's perceptions about J. Howard were and his efforts to strip J. Howard of his assets.

### 4. Hunter's statement that he did not cause the Assignment, Promissory Note, and Pledge (Exs.287–289), to be backdated.

The Assignment, Promissory Note, and Pledge all purport to be dated June 1, 1994. However, Hunter's billing records show that Cherry Doucet of the Hunter Firm worked on "revisions of pledge" on July 11, 1994. (Ex. 649, 103, # 7535.) There is no record of a meeting with Pierce or J. Howard to sign these notes on June 1, 1994, nor are there records indicating that Hunter prepared these documents prior to June 1, 1994. Hunter's Fine Tuning Memo, which was drafted after J. Howard's June 27, 1994 marriage to Vick-

ie, addresses these transactions and indicates that they should occur in the future. (Ex. 310a, p. 6, VII.A.4.)

In an attempt to explain away his billing records indicating that he had worked on these documents, Hunter furthered his dishonesty by suggesting that those records could refer to another pledge, but did not say what pledge that was, or show that it had ever been produced. Finally, Hunter suggests that maybe J. Howard and Pierce caused the documents to be backdated after they were delivered. However, the dates on the documents are all typed, not handwritten in.

### 5. Hunter's statement that he did not cause the donation of the GRAT to the J. Howard Marshall, II Living Trust to be backdated.

The act of donation document purports to be dated January 13, 1994. Hunter testified that he did not backdate the document. That is contradicted by Hunter's Billing records which indicate that on July 12, 1994, Cherry Doucet of the Hunter Firm "[d]rafted donation of interest in GRAT." The January 1994 date is printed like the rest of the document.

### 6. Hunter's Statement that Pierce was never shown the Fine Tuning Memorandum (Ex. 310a).

Hunter's billing records for July 8, 1994 indicate that he drafted the Fine Tuning Memorandum and faxed it to Pierce. (Ex. 649, p. 102.# 7662.) ("Draft Marshall post-matrimonial plan; fax to E. Pierce Marshall . . . ."). This contradicts his statement of loyalty to J. Howard and demonstrates that he was working on Pierce's behalf.

### 7. Hunter's statement that he researched annulling J. Howard's marriage to Vickie to defend J. Howard from any actions taken by Pierce.

Hunter said that J. Howard told Hunter that he was very much in love with Vickie. Hunter, however, began researching annulment in the Fine Tuning Memo. Hunter testified that the reason he began researching annulment is that he was concerned that J. Howard would ask him if Pierce, holding J. Howard's power of attorney, could seek to have J. Howard's marriage annulled. This is completely inconsistent with Hunter's testimony that Pierce always followed his father's orders. Neither Hunter nor J. Howard would be concerned with Pierce seeking to annul J. Howard's marriage to Vickie if Pierce respected his father's decisions and never interfered with J. Howard's relationship with Vickie. Hunter was therefore either lying as to the degree of control exercised by J. Howard over Pierce, or, as the Court finds, as to whom Hunter was preparing the Fine Tuning Memo for.

### 8. Hunter's statement that he believed, in May 1995, that J. Howard would live for 5 years.

This is relevant because on May 26, 1995,[22] J. Howard allegedly approved two documents which changed his estate plan. By the first document, the J. Howard Marshall, II GRAT, created in August 1993, sold back to MPI 47,288 shares of MPI. (Ex. 3376.) The other document was for sale of 63,051 MPI shares to MPI for a private annuity. (Ex. 3770.) Neither of these annuities were scheduled to make payments to J. Howard until March 1996. Hunter, like Pierce, testified that these annuities would have been economically beneficial to J. Howard had he lived for

another five years. Hunter testified that he believed at the time that J. Howard would live for another five years. This is pure fiction.

In May 1995, J. Howard was already ninety years-old, and even reference to actuarial tables would suggest that he had less than five years to live. In fact, a year earlier, Hunter had done just that, finding that at 89, J. Howard had less than five years to live. (Ex. 310a, p. 7–8.) By May 1995, J. Howard had spent a large part of the previous five months in the hospital. On January 24, 1995, J. Howard had been rushed to the Hospital after his heart had stopped, and was only revived after CPR was administered. Townsend testified that he began looking into funeral arrangements for J. Howard in January 1995. Townsend testified that J. Howard never regained a healthy appearance in 1995, and he several times believed that J. Howard was close to death. If J. Howard's advanced age, his near-death experiences, the obvious breakdown of his physical health, his extended hospital stays, and his need for 24 hour nursing care did not make it clear enough to Hunter that J. Howard would not live for another five years, in Spring 1995, J. Howard's physician, Dr. Reed, had diagnosed him with terminal, untreatable and inoperable stomach cancer. In April 1995, Dr. Reed opined that J. Howard might have as little as three months to live.

### 9. Other actions that demonstrated Hunter's lack of credibility

The Court's judgment of Hunter's credibility does not rest merely on these specific lies, made under oath before this Court (some of which were lies that he had been previously made before the bankruptcy court). The Court also finds that his cen-

---

**22.** This document may also have been back- dated, *see infra.*

tral role in the plan to drain J. Howard of his assets, which was undertaken in part to prevent J. Howard from making a substantial gift to Vickie, undermines his credibility.

This Court is not the first to question Hunter's character. Besides the bankruptcy court, which found that Hunter had conspired with Pierce to alter documents and deprive Vickie of her intended gift, Harvey Sorensen's firm, Foulston & Seifkin, found Hunter's ethics questionable. On June 20, 1994, Andrew Wright[23] prepared a research memo for Harvey Sorensen to advise him on his professional responsibilities relating to what Sorensen believed was Hunter's "probable professional misconduct" in altering the GRAT, as discussed in Part W.D.8.ii, *infra*. (Ex. 281, Memo p. 3.) According to Wright, Hunter had acted incompetently, disreputably, had refused to comply with tax regulations, and had done so with the intent to defraud. (Ex. 281, Memo pp. 5, 7.) Wright concluded that Hunter's conduct would be viewed by the Department of Treasury as "disreputable, intentionally fraudulent, and perhaps incompetent." (Ex. 281, Memo p. 7.) Wright recommended that Sorensen report Hunter to the relevant disciplinary bodies. (Id.)[24]

Finally, the Court is concerned that Hunter acted unethically in attempting to impress Pierce with his family's judicial prominence. Vickie's counsel argued that Hunter and Pierce were involved in planning to use these connections to gain an advantage in dealing with J. Howard's estate.

The Fine Tuning Memorandum prepared by Hunter includes statements that deal with estate planning once J. Howard had married Vickie. (Ex. 310a.) Up until Hunter drafted the Fine Tuning Memorandum on July 8, 1994, J. Howard had been co-trustee, along with Pierce, of the J. Howard Marshall, II Living Trust. On page 3 of that Memo, Hunter addresses concerns about how to choose a successor trustee upon J. Howard's death. On page 3, paragraph d, Hunter lists numerous options. The last of these is to "let longest serving federal judge in Texas appoint successor." (Ex. 649, p. 3.) This suggestion is out of place considering that state courts, not federal courts, are primarily responsible for probate matters. *See Marshall III*, 264 B.R. at 621. In the next sentence, Hunter's thinking becomes more clear: "[sidebar . . . my father is now the longest serving federal judge in the United States]" (Ex. 649, p. 3.) (Brackets in original.)

Hunter's father is the Honorable Edwin F. Hunter, Jr., Senior District Judge for the Western District of Louisiana, and as Hunter's Fine Tuning Memorandum indicates, he is the longest serving federal judge in Louisiana and the United States, having been appointed to the Bench by President Eisenhower in 1953.

When taken in context of the other events in this saga, Hunter's self-styled "sidebar" is not an innocuous note to himself. On the next line of the Fine Tuning Memorandum, Hunter's suggestion for the Living Trust was to "[p]ermit the trustee to re-situs trust if it gives an advantage." (Ex. 310a, p. 3.) Indeed, the Living Trust was later re-sited to Louisiana, where

---

**23.** It appears that Andrew Wright is another attorney in Sorensen's firm.

**24.** While the Court has no information as to Sorensen's eventual actions, Foulston & Seifkin informed Pierce and J. Howard that they would not second-chair the tax litigation behind Hunter. Although no reason was given to the Court, the Court believes that Sorensen and his firm did so in a successful effort to disassociate themselves from Hunter.

Pierce initiated succession proceedings. *See Howard Marshall Charitable Remainder Trust,* 709 So.2d at 662. Had Hunter's plans been followed through with, the longest serving federal judge in the state of the trusts' new situs, his father, would have been given authority to choose a successor trustee. There is no evidence before the Court that these thoughts ever evolved past the planning stages, or that Judge Hunter was even aware of his son's plan. However, these events demonstrate Hunter's apparent willingness to exploit his father's high position.

Vickie's counsel points out, however, that this is not the only instance where Judge Hunter is referred to in connection with this matter. Vickie's counsel also argued that Hunter and Pierce were involved in attempting to solicit advice from a judicial officer. On January 27, 1995, Harry Winston sued J. Howard over a bounced check that he had written while purchasing jewelry for Vickie. Disputes arose between Vickie and Pierce, as J. Howard did not have the cash to cover the check. Pierce had been responsible for solving the problem and returning the jewelry to Winston. Vickie, however, never returned the jewelry, and Harry Winston sued. On April 22, 1996, Judge Audrey Collins of the Central District of California, issued findings of fact and conclusions of law in that matter, and entered judgment in favor of Harry Winston. This ruling upset Pierce. In response, Pierce sent a memorandum to Edwin Hunter, outlining numerous strategic alternatives for the Harry Winston case, as well as for Vickie's bankruptcy. (Ex. 431.) [25] Part 2.B of that memorandum details how Pierce and his lawyers could determine his options for legal recourse. Included is the following passage:

2. Obtain all the pleadings and briefs for review by Judge Hunter. I very much appreciate this very valuable step. It would be most helpful to have the Judge's advice regarding what elements are needed to:

 A. Successfully move for a new trial and prevailing;

 B. Successfully move for an appeal and prevailing.

3. After the Judge has had a chance to review the case, Jeff [Townsend] needs to visit with him to discuss the issues and the Judge's advice....

4. Seek the advice of other "wise men" who may be able to help us achieve our objectives A & B above.

(Ex. 431, pp. 1–2.) Pierce confirmed during his testimony that "Judge Hunter" referred to Edwin Hunter's father, Judge Edwin F. Hunter, Jr. Later in the memorandum, where he writes:

I think we were badly home-towned, but perhaps it is good because we will be more ready next time for what to expect

---

25. During the presentation of the case to the Court, several documents were made available to Vickie's counsel by Pierce, with Pierce reserving the right to object to them based on privilege. The Court has not relied on any document as evidence that is subject to a legitimate claim of attorney-client privilege. However, Exhibit 431 is potentially privileged communication from Pierce to his attorney Hunter. The Court, however, finds the exhibit admissible for two reasons. First, throughout the proceedings, Pierce has contended vehemently that Hunter did not represent him, and Hunter has testified to the same effect. Second, this document is admissible under the crime-fraud exception to the attorney-client privilege. *See, e.g., United States v. Chen,* 99 F.3d 1495, 1503 (9th Cir.1996). Here, the communication shows Pierce arranging to have Townsend seek information from a federal judge about a separate pending civil action. This constitutes a fraud on the court and potentially obstruction of justice in violation of 18 U.S.C. § 1503. Pierce's objection of privilege is therefore overruled.

from the California courts. We need to modify our behavior and analysis accordingly. That is the purpose of the experience. We need to use aggressively every opportunity to home-town them in Louisiana,

(Ex. 431, p. 4.)

This memorandum makes clear that, at the very least, Edwin Hunter had offered to Pierce the services of his father, a sitting federal district judge, in analyzing and recommending litigation strategy for a client in an attempt to overturn the ruling of a fellow district court judge.[26] In addition, the phrase "other wise men" appears to refer to other judicial officers in the state.

This conduct gives rise to even more serious questions about Hunter's character. If Hunter was merely seeking advice, on behalf of Pierce, about the prospects for winning a new trial or an appeal, he could have approached dozens of well respected appellate law firms.[27] Approaching a judge, in violation of the principles of ethics, suggests that Hunter was seeking to use Judge Hunter's influence, not just his legal skills, in order to further Pierce's litigation posture. Such an approach is unquestionably unethical, potentially criminal, and certainly shows Hunter's character to be untrustworthy.

The Court concludes that Edwin Hunter's testimony consisted of numerous lies, and that he has no credibility as a witness.[28]

**D. Tortious Acts by Pierce and Hunter that Deprived Vickie of her Expectancy**

*1. Pierce's Knowledge and Motivation*

From early in J. Howard's relationship with Vickie, Pierce knew of the gifts that J. Howard was giving to Vickie. He was aware of J. Howard's pattern of giving to his lovers based on his involvement with the Lady Walker litigation and the related gift tax litigation. Pierce knew that J. Howard was starting that same gift-giving pattern with Vickie. He knew that J. Howard had purchased the Tomball Ranch for Vickie as he had signed the deed as co-trustee of the Living Trust.

In the late fall of 1992, J. Howard was preparing to marry Vickie and planning on making a substantial gift to her. Pierce was present at meetings between his father, Hunter, Townsend and Sorensen when J. Howard detailed the type of gift that he was going to make. J. Howard had asked Pierce to coordinate all the details, and accordingly Pierce had frequent contact with J. Howard's lawyers and knew what their assignments were.

J. Howard's plan to give Vickie money based on the value of Koch Industries stock was immediately problematic. Pierce had been responsible for managing litigation with the IRS, one of the central components of which was the value of Koch Industries stock. Pierce and Hunter recognized that if Vickie had any interest in MPI stock, as proposed in the New Community Memo, she would have an in-

**26.** The fact that the memorandum was written by Pierce indicates that Pierce was complicit in this conduct.

**27.** The Court notes that Pierce has been represented in this matter by the Los Angeles firm Jeffer, Mangels, Butler & Mamaro, one of the most prominent firms in the city.

**28.** In light of Hunter's behavior, the Court encourages the United States Attorney for the Central District of California to undertake a close review of the record in this case to determine whether to seek an indictment for perjury under 18 U.S.C. § 1621.

terest in increasing the value of that stock. The teaming of a widowed wife with the IRS loomed as a bad combination in the goal of keeping down the value of Koch stock. This was crucial to Pierce, who stood to inherit MPI, and owned Koch stock in his own right. Pierce would therefore tolerate his father's extravagant gifts to Vickie in the form of houses, cars, jewelry and cash. But he could literally not afford to allow J. Howard to give Vickie any interest in Koch or MPI.

### 2. The Replacement of Harvey Sorensen with Edwin Hunter

In Edwin Hunter, Pierce found a person who would aggressively pursue his interests. Hunter had an obviously low opinion of Vickie. He was far more willing to be aggressive in tax litigation than Sorensen. Hunter knew that Pierce was already managing the details that J. Howard so despised dealing with. Hunter's practice of law was all about details. He designed creative and intricate estate planning schemes on a daily basis, the success of which were based on the details of the plans. So while J. Howard would pass over details with a dismissive wave of his hand, Hunter knew that the devil, and therefore the power, was in the details. Hunter also knew that, in time, Pierce would control the interests of the Marshall family and MPI, whose representation could prove extremely lucrative to him.

Hunter was aware of J. Howard's long-held estate planning goals. J. Howard never wavered in his desire to leave Pierce in control of MPI and with his Koch Industries stock. But J. Howard's reckless cavorting with Vickie could endanger those plans. Hunter therefore would act as a guardian of J. Howard's interests.

Sorensen was not so amenable. His ethics were different than Hunter's. Pierce eventually informed Sorensen that he was no longer responsible for Marshall family work. (Ex. 230.) This decision was J. Howard's, who preferred Hunter's more aggressive approach to the IRS. However, this decision was made at the counsel of Pierce, who was given the ultimate responsibility for terminating Sorensen.

J. Howard was notoriously loyal to the people that had worked for him. In the 1960's, when Finley Hilliard had left the accounting firm of Peat Marwick, J. Howard had demanded that his business go with Hilliard, and threatened Peat Marwick that he would personally defend Hilliard if they sued him. This loyalty would not allow him to terminate his attorney of ten years, a man that had become his closest legal adviser and a friend that stayed at his home in Houston, without some outside provocation.

Pierce was responsible for following the details of the Lady Walker litigation. He was the only person that could describe the advantages of one or the other to his father. J. Howard also placed immense trust in Pierce. Thus, when Pierce suggested to J. Howard that Hunter replace Sorensen, J. Howard consented.

### 3. August 1993 Changes to J. Howard's Estate Plan

Evidence of the scheme to drain J. Howard of his assets is demonstrated by the immediate changes to J. Howard's estate planning once Hunter took over. In December 1992, Sorensen had devised a method for J. Howard to begin to give up his controlling interest in MPI. (Ex. 60.) This was important for estate planning reasons. By converting his voting stock to non-voting stock, it would be given a non-voting discount in valuation. Additionally, if he was able to bring his percentage ownership under 50%, he would not suffer the upward adjustment for a controlling interest and would be able to take a dis-

count for a minority position. J. Howard, however, had never voluntarily given up control of anything in his life. He had insisted on being in charge. In his deposition in the Lady Walker litigation, he insisted that MPI never took directions from anyone other than himself. Accordingly, Sorensen had devised a plan for J. Howard to obtain an irrevocable proxy over Pierce's MPI stock. (Ex. 60.) J. Howard would then be able to control MPI by voting Pierce's stock.

In August 1993, Hunter told J. Howard that this arrangement was unworkable. He contended that if J. Howard gave stock to Pierce with an irrevocable proxy, it would be an incomplete gift, and subject to the estate tax upon J. Howard's death. Despite his proven creativity in tax and estate matters, Hunter told J. Howard that the only way to give up his controlling interest was to sell his shares and trust Pierce to vote the way J. Howard told him to.[29]

In preparation for his meeting with J. Howard, Hunter sent him an estate planning packet of 151 pages. (Ex. 3285.) Based on his past experience with J. Howard, including his drafting a pre-nuptial agreement for J. Howard and Vickie in December 1992, Hunter knew that J. Howard wanted legal documents that were a page or two long. Instead of following these well-known preferences, Hunter buried J. Howard in paperwork, filled with details, that Hunter knew J. Howard would never review.

J. Howard was also capable of being controlled by Hunter and Pierce because of his physical inability to read as a result of having developed cataracts. Thus, J. Howard only read papers printed in extremely large type, and then only with the assistance of reading glasses. J. Howard's practice was to have someone read the document to him. Hunter was responsible for reading a number of documents to J. Howard.

On August 25, 1993, J. Howard signed several documents relating to MPI and his estate planning:

i. J. Howard resigned as a trustee of the MPI voting trust, the trust that technically controlled the voting stock of MPI. (Ex. 3289.)

ii. He sold to Pierce 35,466 shares of MPI stock, representing 15% of the outstanding stock of MPI. (Ex. 3292.)[30] Pierce bought those shares with a promissory note in the sum of $17,355,000, at a rate of 6.26% interest. (Ex. 3291.) The note called for Pierce to pay $575,000 on the first of January and July of each year, with a balloon payment in ten years (the Pierce Note). (Id.)[31]

iii. J. Howard signed a Grantor Retained Annuity Trust (GRAT). (Ex. 3293.) J. Howard transferred 47,288 shares of MPI, representing 20% of the outstanding

**29.** The Court suspects that there were several other ways of insuring J. Howard's control of MPI, including an irrevocable proxy on the shares owned by Eleanor Pierce Marshall Stevens, who appeared to leave many business decisions in her ex-husband's hands, or by giving J. Howard a proxy of the shares of MPI that Pierce had previously acquired, which, combined with J. Howard's 49% interest, would be sufficient to keep J. Howard voting a majority of the MPI shares, and thus in complete control.

**30.** At the time, J. Howard owned 164,252 shares of MPI stock. The total number of outstanding MPI shares at the time was 236,440. J. Howard therefore owned approximately 69.5% of MPI before these transactions.

**31.** J. Howard did not live ten years to receive the balloon payment. The Pierce Note, meanwhile was later assigned to the Living Trust, of which Pierce was the primary beneficiary. The result was that Pierce avoided paying a substantial sum due on the note.

shares, to the GRAT. J. Howard would receive a payment from the GRAT each year for five years, after which the shares would transfer to Pierce.[32]

iv. J. Howard gave Pierce an outright gift of 2044 shares of MPI, with Pierce responsible for paying the gift taxes. (Ex. 3288.)

v. J. Howard sold back to MPI 14,065 shares in order to cancel his outstanding debt to MPI. (Ex. 3294.)

The result of these transactions was that J. Howard's ownership interest in MPI was reduced to 65,389 shares, a mere 29% of his corporation. The beneficiary of these transactions was Pierce. Although now legally in control of MPI, Pierce's goal was to prevent a transfer to Vickie that might increase the purported value of his shares and undermine the ongoing litigation with the IRS.

### 4. The Wedding of J. Howard and Vickie and the Surveillance of J. Howard

On June 27, 1994, J. Howard married Vickie. Several members of J. Howard's personal and MPI staff were invited, although Pierce was not. The next day, Pierce and Hunter held a conference call with Henry Schlesinger, who was invited to the wedding. (Ex. 649, p. 101). Pierce

and Hunter likely found out about the wedding that day from Schlesinger.[33] This began a flurry of activity by Pierce, Hunter and others to alter J. Howard's estate plan so as to prevent Vickie from receiving a gift and undermining their hard work to reduce the apparent value of MPI stock.

On July 6, 1994, J. Howard left for Los Angeles to visit Vickie. (Ex. 3326, p. 4.) With Pierce's authorization, Dan Hedges hired private investigators to trail J. Howard in California. Pierce had the bills sent directly to his home address in Dallas. Pierce claims that this trail was for J. Howard's protection because Vickie's bodyguard, Pierre DeJean posed a safety risk to J. Howard. The Court, however, finds that the surveillance was not for J. Howard's protection, but instead was to guarantee against J. Howard signing a new will while in California. The Court's finding is based on the following reasons.

i. Pierce and Hedges did not tell J. Howard's driver Arnold Wyche, or J. Howard, that J. Howard was being trailed for his own safety. If Pierce was concerned with J. Howard's safety, he would have told J. Howard and Wyche to warn them of the potential threat.

ii. The surveillance in California ended between 7 PM and 9 PM in the evening. (Ex. 3326.) If DeJean posed a serious

---

**32.** In the event of death, most of the shares in the GRAT would revert to J. Howard's estate.

**33.** Hunter claims to have found out in Houston from J. Howard himself. There are no records of this meeting with J. Howard. As noted *supra*, the Court does not find Edwin Hunter credible. Nevertheless, it is clear that Hunter knew about the marriage before July 6, 1994, when J. Howard left to visit Vickie in Los Angeles. Pierce claims that he found out about J. Howard's wedding on July 11, 1994 from Dan Hedges, another of J. Howard's attorneys. The Court finds this incredible. The evidence in Hunter's billing records indicates that Hunter faxed to Pierce the Fine

Tuning Memo, which refers to the wedding (Ex. 310a), on July 8, 1994. (Ex. 649, p. 102.) Additionally, Hunter's billing records show numerous conversations with Pierce after Hunter had found out about J. Howard's wedding, and there is every reason to believe that Hunter told Pierce. Finally, J. Howard's wedding was common knowledge at the MPI offices, and Pierce had by that time become President of MPI. It is therefore incredible that Pierce did not know about the wedding shortly after it occurred. Evidence of surveillance placed on J. Howard while he traveled to Los Angeles after the wedding further corroborates this finding.

threat to J. Howard's safety, it would have been a twenty-four hour threat. Instead, the surveillance ended around the time that J. Howard typically went to bed and would therefore not be able to sign a new will or other document in favor of Vickie.

iii. The surveillance was of J. Howard, not Pierre DeJean. (Ex. 3326.) If Pierce were concerned about J. Howard's safety, he would have DeJean trailed to check his contacts and his actions.

iv. On February 17, 1995, Townsend sent a letter to Vickie's lawyer Patrick Freydl. (Ex. 84.) He indicated to Freydl that:

> [i]t has been reported by reliable sources that either a will, or other type of contract, was executed by Mr. Marshall in California, and that you prepared such a will or contract. On behalf of Mr. Marshall, demand is made for immediate production of any document executed by him. . . . In order that there is no question as to my exact request, please note that I am requesting the original. . . .

(Ex. 84.) [34]

On February 24, 1995, Dan Hedges sent a letter to Pierce, copied to Hunter and Townsend, informing Pierce that Freydl had denied writing a will. (Ex. 675.) The letter states that this contradicts DeJean's information on a will. Pierre DeJean was evidently the "reliable source" that Townsend referred to. It is unlikely that Pierce considered DeJean a danger to J. Howard in July, but by February considered him a "reliable source."

v. The investigators hired by Pierce kept a liaison with the Federal Bureau of Investigations based on their stated fear that Vickie and DeJean might become involved in interstate or wiretap fraud in their attempt to obtain J. Howard's assets, but never contacted local authorities to express their professed concerns about J. Howard's physical safety. (Ex. 3326, p. 12).

vi. In the Fine Tuning Memo of July 8, 1994, Hunter indicated the major concerns regarding J. Howard traveling to California:

> J. Howard's office believes Vickie's attorneys in California may be preparing documents for his signature, possibilities include:
>
> a. A new will
>
> b. Adoption of Vickie's child
>
> c. Gifts to Vickie

(Ex. 310a, p. 1.)

The concerns of Pierce, Hunter, and "J. Howard's office" [35] demonstrate that they believed that J. Howard could in fact be controlled and tricked into signing away his estate. Their concern was not unfounded. Pierce and Hunter had already drained him of significant assets in August 1993. They now set out on a plan to continue that drain before Vickie's lawyers could get their hands on J. Howard's assets. Despite all the concern of Pierce, Hunter, and "J. Howard's office," there was never any evidence introduced that Vickie or her lawyers attempted to have J. Howard sign a will, adoption documents, any gift instrument, or any other document divesting J. Howard of his wealth.

---

34. Townsend's request for the original is particularly troubling. Given the record of document tampering in this case, there is an obvious concern that an original in the hands of Pierce and Hunter would be altered or destroyed.

35. This likely refers to Eyvonne Scurlock and Henry Schlesinger.

### 5. July 1994 Changes to J. Howard's Estate Plan

On July 8, 1994, Edwin Hunter drafted the Fine Tuning Memo. (Ex. 310a.) This is reflected in his billing records for July 8, 1994. (Ex. 649, p. 102, # 7662.) This memo formed the foundation of plans to prevent J. Howard from making a gift involving MPI or Koch stock that would disrupt the gift tax litigation or run the risk of valuing Koch stock at a high price. The thrust of the plan was to make sure that any property owned by J. Howard be put into his living trust and to make his living trust irrevocable so that J. Howard would be unable to make any gifts to Vickie. Hunter's Fine Tuning Memo indicates the importance of making the living trust irrevocable. Were J. Howard, then eighty-nine years old, to be declared incompetent, Vickie, as J. Howard's wife, would have the preference under both Texas and California law of being appointed guardian of J. Howard. (Ex. 310a, p. 2, B.1–2.) Hunter notes that "[h]er appearance as J. Howard's guardian might disrupt the estate plan and could lead to litigation with the family." (Ex. 310a, p. 2, B.4.) Hunter and Pierce were concerned that Vickie's meddling might lead to a transfer of property away from Pierce and to her, leading to a high valuation of Koch stock. Moreover, making the trust irrevocable would leave "less for mischief (or Miss Cleavage)," meaning Vickie. (Ex. 310a, p. 12, 2.a(2).) Hunter's office immediately began drafting several documents to accomplish this goal.

Along with several other goals, Hunter and Pierce addressed the August 25, 1993 Pierce Note. Under Texas Community Property law, income derived from J. Howard's separate property would be community property. (Ex. 310a, p. 4, IV. A.1.b.) Hunter's office then prepared documents to prevent Vickie from ever being able to collect any of the money from Pierce's payments on the note. J. Howard signed a promissory note to MPI for $5,618,074. (Ex. 288.) [36] To secure this debt, J. Howard pledged to MPI the August 25, 1993 Pierce Note. (Ex. 289.) This would allow MPI, now run by Pierce, to intercept the note payments before they reached J. Howard and Vickie, and use the payments to pay down the debt owed to MPI. (Ex. 310a, p. 6, VII.A.4.b.) Because the Living Trust was also being made irrevocable, Vickie would never be able to recover those proceeds. Hunter was concerned that by encumbering the note, there might be an improper interference with Vickie's community property interest in the income stream. To solve this problem, those documents were then backdated to June 1, 1994, before J. Howard and Vickie were married, as detailed in Part IV.D.8.iv, infra. By backdating the note, it also served to void any instrument assigning the note to Vickie as a gift that they feared J. Howard might have signed while in California.

On July 12, 1994, Hunter, Pierce, Jeff Townsend, Hilliard, Scurlock, and J. Howard met at the MPI offices in Houston. Pierce at that time confronted his father about his marriage, at which point J. Howard admitted to Pierce the he had married Vickie. The group briefly discussed estate planning options with J. Howard and was ordered to reconvene the next day.

---

**36.** The comments in Hunter's Fine Tuning Memo suggest that this was money that J. Howard already owed to MPI. (Ex. 310a, p. 6, VII.A.) Indeed, it was J. Howard's custom to support himself by borrowing funds from MPI, which in turn borrowed funds from Texas Commerce Bank, backed by MPI's interest in Koch. J. Howard would then settle the debt with MPI by selling shares of stock back to MPI. These debts, however were unsecured.

On July 13, 1994, and again on July 15, 1994, Hunter, Pierce, Townsend, Hilliard, Scurlock, and J. Howard met at the MPI offices in Houston to sign J. Howard's estate planning documents. Because J. Howard could not see well enough to read the document, Hunter read to J. Howard what he considered to be the pertinent provisions of the Amended and Restated Living Trust. Pierce was in the next room when Hunter read the document to J. Howard, but was present when J. Howard allegedly signed the Amended and Restated Living Trust. During this period, J. Howard also signed the Assignment, Pledge, and Promissory Note that purport to be dated June 1, 1994. (Exs.287–289.) J. Howard also signed an act of procuration (power of attorney) and a donation of his membership in the River Oaks Country Club to the Living Trust during this period.

After J. Howard had signed the Amended and Restated Living Trust, a new page two of the trust was inserted, as detailed in Part IV.D.8.v, *infra*. The new page contained the provision stating that the trust was irrevocable. Because J. Howard was totally dependent on Hunter to inform him of the contents of the document, he was unaware that the amendments made the trust irrevocable. The evidence shows that nearly a year later, he still believed that he had total control of his assets. On May 26, 1995, J. Howard made a tape recorded statement to the judge in the guardianship proceedings wherein he stated: "despite what Pierce or anybody says, I have been a successful businessman and am not broke." (Ex. 364.) By that time, however, J. Howard had been stripped of his remaining assets and was technically broke. Furthermore, Glenn Johnson, who was appointed by the Texas probate court as J. Howard's temporary guardian on May 31, 1995, testified in the Texas probate proceedings that he had a conversation with J. Howard about his estate plan. According to Johnson, J. Howard's opinion of the changes to his estate plan were as follows: "He trusted Pierce and had no problem with it, and if he ever didn't like it, he could change it." (Ex. 3638.) However, because the Living Trust had been made irrevocable, and J. Howard divested of all his MPI stock, he could not change his estate plan. J. Howard had been duped.

Following the signing of the Amended and Restated Living Trust, the document was given to J. Howard's assistant Scurlock, who also notarized the signatures. Four to six days later,[37] on July 19, 1994, Scurlock gave the document to Townsend for him to record. Townsend then took the document from Houston to his office in Lake Charles, Louisiana. The next day, Townsend had a stack of copies of the document made at his office. In his office, Townsend had a relatively modern photocopy machine equipped with a document collator. Townsend's plan was to record the document and provide the copies to the county recorder to certify, saving the time and expense of having the county recorder copy the documents.

The morning after Townsend had the copies made, he flew from Lake Charles to Midland, Texas. From Midland, Townsend drove approximately 30 miles south where he recorded the Amended and Re-

---

**37.** There was a disagreement about whether the Amended and Restated Living Trust was signed on July 13, 1994 or July 15, 1994, thus it is unclear whether there were four or six days between its execution and its delivery to Townsend for recording. This is due in part because page one and page twenty-two indicate two different dates of execution. Although this is an example of the many questionable factors of the document, *see* Part IV.D.8.v, *supra*, the discrepancies between July 13 and July 15 appear to be immaterial.

stated Living Trust in Glasscock County, Texas. Glasscock County is one of the smallest counties in Texas. It has a single courthouse, but there are no lawyers in the County. Glasscock County's sole prior claim to fame was that it had a lakebed that filled every 20 years.

Upon arriving at the Glasscock County Courthouse, Townsend met the county clerk, Betty Pate, and her deputy, Shirley Wood. They informed Townsend that they could not use his copies, and would instead have to make the copies of the document in the county offices. Townsend discarded the copies he had brought from Lake Charles and Pate and Wood proceeded to make approximately 40 copies of the document on the Glasscock County copy machine, and collated the copies by hand. The original was then recorded and the copies certified. Townsend then used the certified copies to record the trust instrument by mail in several counties in Texas and parishes in Louisiana.

Had the Living Trust been recorded in Harris County, the public records would have been more readily accessible, and it is possible that the press would have found out the details of J. Howard's personal finances. Indeed, another of J. Howard's lawyers, Dan Hedges, had obtained public record information of J. Howard's wedding to Vickie. Recording the document in the smallest county in Texas made that nearly impossible. One explanation for this is that Pierce did not want a story printed, or a friend of J. Howard's telling him, about the Living Trust being made irrevocable.

### 6. Further Changes to Estate Plan Between July 1994 and May 1995

Over the next year, J. Howard's health deteriorated. He was hospitalized on three different occasions, diagnosed with terminal cancer, and never recovered his physical strength. J. Howard's ill-health engendered a guardianship dispute between Pierce and Vickie. On May 31, 1995, the Texas probate court appointed Glenn Johnson the temporary guardian of the person of J. Howard. After Johnson's report to the probate court, Betty Morgan was appointed permanent guardian.

Several final changes to J. Howard's estate plan were undertaken during this time. Pierce and Finley Hilliard, as trustees of the J. Howard Living Trust, re-sited the trust to Louisiana. (Ex. 341.) As Hunter had written in the Fine Tuning Memo, this was an option to exercise if it would give them an advantage. (Ex. 310a.) By moving the trust from Texas to Louisiana, Pierce, Hunter and Hilliard were taking advantage of Hunter's familiarity with Louisiana—they were preparing to "hometown" any opponents, as Pierce would later describe it. (Ex. 431.)

Acting under his power of attorney, Pierce signed a document renouncing J. Howard's right to collect distributions from the living trust. (Ex. 145.) The renunciation was purportedly signed on December 28, 1994. According to Pierce, he read the document over the phone to J. Howard, who was then at his home in Houston. Pierce claims that J. Howard then told him to sign the document. This claim is not credible. It was J. Howard's intent to keep for himself as much income as he could, allowing him to finance his lifestyle and his gifts to Vickie. He had no interest in renouncing his right to obtain income from the living trust.

Pierce may have signed this document in the Spring of 1995, while he was feuding with Vickie over spousal support and guardianship. Pierce had discontinued paying Vickie's bills, and by renouncing J. Howard's right to demand income from the Living Trust, he would be cutting off Vickie's derivative rights.

Furthermore, the document is irregular on its face. It was notarized by Eyvonne Scurlock. As detailed in these findings, Eyvonne Scurlock fraudulently notarized several backdated documents prepared by Hunter. Her notary book bears no record of having notarized the Renunciation on December 28, 1994. (Ex. 676.) Moreover, Finley Hilliard's signature as a co-trustee of the living trust was not notarized until February 22, 1996, more than six months after J. Howard's death. (Ex. 145.)

Accordingly, the Court finds that the document was not signed in December 1994.

### 7. May 1995 Changes to the Estate Plan

The last set of changes to J. Howard's estate planning purportedly took place on May 26, 1995. J. Howard's remaining 63,051 shares of MPI stock were sold back to MPI in exchange for a private annuity. (Ex. 3370.) Under the terms of the annuity, MPI would pay J. Howard $7,906,006 on March 31 of each year, commencing in 1996, as long as J. Howard was alive. (Ex. 3370.) [38] J. Howard did not live to see March 31, 1996, and accordingly the MPI ended up paying nothing for J. Howard's remaining shares. Nor could J. Howard

be reasonably expected to live until March 31, 1996. J. Howard had been diagnosed with terminal stomach cancer in Spring 1995. Pierce, who signed the Sale for Private Annuity as both the co-trustee of the J. Howard Living Trust and as President of MPI was entirely aware of J. Howard's condition. He had been advised of the diagnosis by J. Howard's physician Dr. Reed in April 1995. Pierce therefore arranged to strip J. Howard of his final vestiges of ownership in MPI for no consideration.

Also purportedly on May 26, 1995, the GRAT sold to MPI the 47,288 shares of MPI that it held in exchange for a $24,753,376 note. (Ex. 3376.) The terms of the note were that MPI would pay interest of approximately $1,898,584 to the GRAT each year, with the principle on the note due in 2010.[39] (Ex. 90.) Transferring the stock out of the GRAT was necessary to prevent MPI stock from falling into Vickie's hands, because if J. Howard were to die before 1998, 99% of the corpus of the GRAT would return to J. Howard's "estate." (Ex. 3293.) Pierce had been continually concerned that J. Howard might have signed a will in California, giving money and possibly leaving his residuary estate to Vickie. This concern motivated him to conduct surveillance on

**38.** The annuity provided that the payment would increase by 20% each year.

**39.** Pierce testified that, had J. Howard lived until March 31, 1996, MPI would have had to borrow nearly $10 million to finance the payments due on the private annuity and note. At the time, MPI had obtained a $15 million line of credit from Texas Commerce Bank, secured by MPI's interest in Koch stock. According to Pierce, Texas Commerce Bank had become concerned with the amount of money outstanding to MPI. It had insisted that MPI reduce its debt to $12 million and that it stop taking out loans to finance J. Howard's personal spending. It is therefore unfathomable how Pierce would have been able to convince Texas Commerce Bank to nearly double

MPI's line of credit to pay the amounts due under the note and the private annuity. Moreover, even if it had been able to borrow enough to pay the amounts due in 1996, Hunter testified that the private annuity would only be a good business decision for J. Howard if he lived for five years or more. Thus, MPI would have had to borrow nearly $50 million over five years to finance J. Howard's personal spending, at a time when its lender had reduced its line of credit from $15 million to $12 million. The testimony that the May 1995 transactions were legitimate and sound business decisions, undertaken at the behest of J. Howard, is contradictory and therefore not credible.

J. Howard while he was in California, (Ex. 3326), was expressed in Hunter's Fine Tuning Memo, (Ex. 310a, p. 4, "C. Effect of a Clandestine California Will"), was evidenced by Townsend's letter to Pat Freydl indicating that Townsend had information that Freydl had prepared a will for J. Howard, (Ex. 84), and was the motivation for making the Living Trust irrevocable.

Pierce and Hunter both testified that these changes were undertaken at J. Howard's direction. This was in the face of the obvious incredibility of a ninety year-old man, diagnosed with terminal cancer, agreeing to give up his last assets in exchange for an annuity that he would never live to see paid. Moreover, Pierce did not believe that J. Howard had the capacity to make these decisions. On May 26, 1995, Pierce signed a Directors Consent stating that J. Howard no longer had the capacity to act as a director for MPI, and removed him from the MPI board. This made Pierce the sole director. (Ex. 3375.)

Even if the Court were to view Pierce's actions as good faith efforts to preserve his father's long-held estate planning wishes, which it does not, his actions still defy both the law and fundamental ethics. Beyond the legal questions that the Court has had to deal with, there are philosophical questions as to whether an elderly person has the right to spend his money as he chooses, even if he does so in a foolhardy way. Whatever his personal actions, J. Howard had earned his life's fortune, and Pierce never had the right to interfere with the way that J. Howard saw fit to spend it.

### 8. Destroyed, Altered, Backdated, and Fraudulent Documents

Pierce and Hunter's actions of slowly draining J. Howard of assets in order to prevent a gift to Vickie were egregious in nature. What is worse, however, is that many of the documents at issue in the case were destroyed, backdated, altered, or prepared and presented to J. Howard under false pretenses. This was done in order to prevent Vickie from receiving funds, out of fear that J. Howard might sign a will or other gift instrument at Vickie's behest, and to avoid the legal consequence of important dates in J. Howard's final years including his marriage to Vickie and the appointment of a guardian ad litem to manage his affairs.

The backdating and altering of the documents was done with the full knowledge of Pierce. Most of the backdated documents were prepared by Edwin Hunter, whose brilliant machinations on estate planning Pierce relied on to devise the necessary actions. Finally, many of the backdated documents were notarized by Scurlock who violated her oath by signing false notarial statements.

The documents subject to destruction, backdating, altering or false pretenses were:

### i. The draft of the catch-all trust prepared by Hunter prior to his December 1992 meeting with J. Howard

As detailed in Part IV.C.1, *supra*, the evidence shows that Hunter prepared a "catch-all" trust prior to his December 1992 meeting with J. Howard, that was a mechanism for J. Howard to give a substantial gift to Vickie. That document was never produced by Hunter.

### ii. The Grantor Retained Annuity Trust (GRAT) (Ex. 3293)

This document was originally signed by J. Howard on August 25, 1993, and held 47,288 shares of MPI. The document was altered by Hunter in March 1994.

In early 1994, Harvey Sorensen, who was responsible for filing tax returns for

MPI, pointed out to Hunter that the copy of the GRAT that he had received in September 1993 was not qualified to hold shares of a subchapter "S" corporation under the Internal Revenue Code, and therefore MPI's subchapter "S" election was in jeopardy. Although Hunter responded that it complied with an IRS Private Letter Ruling (*see* Ex. 133), he simultaneously directed Cherry Doucet to revise the GRAT. Doucet prepared revisions of the GRAT on March 2, 1994. (Ex. 649, p. 11.) Page two of the GRAT was then substituted. (Ex. 281, Sorensen letter stating his conclusion that the GRAT had been altered.) The revised GRAT added the following sentence to paragraph four of the GRAT: "Grantor may substitute property of equivalent value for the original trust corpus." (*Compare* Ex. 245 with Ex. 3293.) Because the substituted sentence added a line to page two, another line had to be deleted from the page so as to not disturb other pages, including the signature page. Paragraph 10(a) of the GRAT defined the Trustee's powers "[t]o sell at public or private sale . . . real estate. . . ." (Ex. 245.) The superfluous words "at public or private sale" were deleted, eliminating a line from paragraph 10(b), allowing the revised page two to be inserted in place of the original. (*Compare* Ex. 245 with Ex. 3293.)

Hunter then sent the revised pages to Sorensen. (Ex. 281.) Sorensen believed at first that the page was substituted and refused to sign the tax return until he had gotten an explanation from J. Howard or Hunter. Sorensen later called J. Howard's office and was told by Eyvonne Scurlock and Edwin Hunter that there had been a "mis-collation" because everyone was in a hurry because of J. Howard's impending marriage. (Exs. 316, 317.) The

alteration of this document demonstrates Hunter's practice of altering documents.

### iii. The Donation of the GRAT to the Living Trust (Ex. 268)

The document purports to be dated January 13, 1994. However, Hunter's Billing records indicate that on July 12, 1994, Cherry Doucet of the Hunter Firm "[d]rafted donation of interest in GRAT." (Ex. 649, p. 103, # 7533.) The document also purports to be notarized on January 13, 1994, by Scurlock, yet Scurlock's Notary Book does not include a record of notarizing the document. (Ex. 676.) The GRAT originally provided that if J. Howard died prior to its expiration in 1998, 99% of the MPI shares that it owned would revert to J. Howard's estate, which Pierce and Hunter feared would go to Vickie through a "clandestine California will." By transferring the ownership of the GRAT from J. Howard to the Living Trust, they hoped to insulate the GRAT from ever passing MPI stock to Vickie.[40] Additionally, by backdating the document, they would insure that it had not been transferred to Vickie while J. Howard was in California.

### iv. The Promissory Note to MPI, the Pledge, and Assignment of the Pierce Note (Exs.287–289) all of which are dated June 1, 1994

These three documents were in fact signed on July 13 or 15, 1994. Hunter's billing records show that Cherry Doucet of the Hunter Firm "[d]rafted pledge and assignment; Drafted promissory note" on July 11, 1994. (Ex. 649, p. 103, # 7535.) There is no record of a meeting with Pierce or J. Howard to sign these notes on June 1, 1994, or records indicating that Hunter prepared these documents prior to

---

40. In May 1995, Pierce and Hunter arranged to sell the GRAT's MPI shares back to MPI for cash, to make absolutely certain that Vickie would never have any MPI stock.

June 1, 1994. Hunter's Fine Tuning Memo, which was drafted after J. Howard's June 27, 1994 marriage to Vickie, indicates that these transactions should occur in the future. (Ex. 310a, p. 6, VII.A.4.) The documents also purport to be notarized on June 1, 1994 by Scurlock, yet Scurlock's Notary Book (Ex. 676) does not include a record of notarizing the documents on June 1, 1994, or at any date thereafter. As noted, *supra,* these documents allowed Pierce, at his discretion, to stop the flow of income from J. Howard, and instead re-direct the payments to MPI. Because the income would have been community property, Vickie had an interest in these notes after she married J. Howard, and thus the backdating deprived her of that interest without her involvement. Additionally, the documents effectively eliminated J. Howard's ability to give or bequeath to Vickie the August 25, 1993 Pierce Note, as it was encumbered by the note to MPI.

### v. The Amended and Restated Living Trust of July 13, 1994

The Amended and Restated Living Trust dated July 13, 1994 had key pages substituted. Donald J. Fandry, a forensic document expert, undertook an extensive examination of this document. (AP 023175–023206.) Fandry found that page two was added to the Amended and Restated Living Trust after the date of July 13, 1994. According to Fandry, the second page, where the Living Trust was made irrevocable has a different type of paper with no watermark, whereas the other pages all contain a watermark, "Eatons Eminence bond U.S. Berkshire."

Additionally, Fandry found that the printing on this second page is also a different type of printing process indicating that it was printed at a different time and/or on a different printer. The toner spattering, when inspected under a microscope revealed that the toner is much broader on the watermarked pages. The toner spattering on page two is much cleaner, meaning less spattering of toner.

Finally, Fandry found that the staple hole patterns do not match other pages indicating that pages were substituted subsequent to the initial completion of the document.

Fandry also found that page three of the living trust was substituted. According to Fandry, the staple holes on page three also show a marked discrepancy with other pages. As an example, there are significantly less staple holes on page three than page four. The indentations of the staple wire patterns are not consistent with other pages. The holes and indentations do not line up.

Another expert, J.L. Hale, Jr., reviewed the Amended and Restated Living Trust Document and came to similar conclusions as Fandry. (Ex. 686.) Hale confirmed that page two has no watermark, that the staple patterns are different from the other pages, and that it was printed with a different quality printer. Hale also points out that page three has staple hole patterns that are inconsistent with the rest of the document. In addition, Hale notes that the watermark on page three is upside-down, indicating that it was inserted into the document at another time than the other pages. According to Hale, "Page 2 was inserted to replace a different page at some point ... [and it] is patently obvious that page 3 was inserted at some point to replace a different page." (Ex. 686.)

Based on this analysis, and the Court's own review, the Court agrees with both Fandry and Hale that pages two and three were substituted. Pages two and three include Article III, which reads as follows:

This trust shall be irrevocable. The Settlor expressly reserves the power to

substitute E. Pierce Marshall, Elaine T. Marshall, or any § 170(b)(1)(A) organization for the beneficiary of any established in the instrument. For the purposes of this Article III, the term " § 170(b)(1)(A) organization" shall have the meaning attributable to it by the Income Tax Regulation § 1.170 A–G.

Further, Settlor expressly reserves the right to reduce any distributions set forth in Article VI, Paragraph B, any such reduction increasing the portion of the trust estate under Article VI, Paragraph C. Settlor shall exercise these powers by notarial act.

Except as provided in this Article III, the Settlor shall have no power to alter, amend, modify or change this trust indenture.

All statements or references to the Trust being irrevocable are set forth in Article III, which is contained entirely on pages two and three. These pages have been substituted due to intentional acts by Hunter, with the knowledge of Pierce. Moreover, there is no evidence, other than the self-serving statements offered by Pierce and Hunter, that J. Howard had ever before sought to make the Living Trust irrevocable, despite numerous opportunities to do so in the preceding ten years. The trust provisions were read to J. Howard, and the pages containing the irrevocable clause were substituted after the document was executed. Because of these intentional acts, the Court finds that the pages the original pages set forth a revocable trust.

Fandry and Hale opine that not only does the Amended and Restated Living Trust contain substituted pages, which J. Howard would not have seen, but that in fact, J. Howard's signature on page twenty-two of the document is forged. Fandry and Hale undertook significant handwriting analysis to determine that the signature of J. Howard was likely not genuine. Moreover, Hale found that the watermark on page twenty-two is also upside-down, corroborating his opinion that J. Howard's signature was forged.

These three pages are the most critical pages in the Amended and Restated Living Trust. Pages two and three make the trust irrevocable, while page twenty-two is the page on which J. Howard purportedly signed the document. These three pages are the only ones that have been drawn into dispute during the course of the litigation between the parties, and are the pages that served to insure that J. Howard could not make a substantial gift of his wealth to Vickie.

It is also clear from the record that the Amended and Restated Living Trust was not immediately recorded. Instead, it was kept in the possession of either Pierce, Hunter or Scurlock for four to six days, until July 19, 1994. At that point, the document was given to Townsend, who returned to Lake Charles with it and subsequently recorded it in Glasscock County, Texas on July 21, 1994.

The testimony of Hunter and Pierce border on a concession of substitution of these pages. The explanation offered by Hunter is that possibly J. Howard himself substituted these two critical pages. There is absolutely no testimony or evidence of anything that approaches this ludicrous speculation. The suggestion that J. Howard, who had just had this document read privately to him by Hunter, subsequently got his hands on the document and attempted to read the unreadable and then went to a word processor and typed out these new pages and stapled them together is unbelievable. Furthermore, the evidence shows that, up until the time of his death, J. Howard believed the Living Trust was revocable. *See* Part IV.D.5, *supra.*

### vi. The Sale for Private Annuity (Ex. 3370)

As detailed, *supra*, this document was signed under false pretenses. Under the terms of the document, in May 1995, J. Howard sold to MPI his remaining shares of MPI stock for an annuity that would not begin paying until March 1996. Hunter represented that this would be a sound business investment if J. Howard lived another five years. However, at the time, J. Howard had been extremely ill and had been hospitalized three times in the previous five months. His health was so poor in January that Townsend began looking into funeral arrangements. Even to the extent that J. Howard recovered after January 1995, it was clear that J. Howard, then ninety years-old, would not live for five years, as he had been diagnosed in April 1995 with terminal stomach cancer.

This document is also a case of self-dealing. Pierce signed the document as co-trustee of the living trust and as President of MPI. Thus, he was improperly involved on both sides of the transaction. Moreover, Pierce was the only one that stood to benefit from the sale. By May 1995, Pierce had become the primary shareholder of MPI. He also stood to receive any outstanding shares then owned by his mother, Eleanor, as the residual beneficiary of her charitable trust. Thus,

by having MPI purchase J. Howard's remaining shares, he was becoming the sole shareholder of the company. He was able to do this without paying anything to J. Howard since Pierce knew that J. Howard would not live to collect the proceeds of the annuity.[41] Furthermore, Pierce stripped him of his last remaining interest in MPI which he could have given to Vickie.

### vii. The Renunciation of J. Howard's right to receive distributions from the Living Trust (Ex. 145)

Acting under his power of attorney, Pierce purportedly signed this document for J. Howard on December 28, 1994. However, as demonstrated in Part IV.D.6, *supra*, that claim in not credible and the document is irregular on its face. Pierce's signature purports to be notarized by Eyvonne Scurlock, but there is no such record in her notary book. (Ex. 676.) Moreover, Finley Hilliard's signature as a co-trustee of the Living Trust was not notarized until February 22, 1996, more than six months after J. Howard's death. (Ex. 145.) The document may have been signed in Spring 1995, as part of Pierce's plan to cut Vickie off or in February 1996, after J. Howard's death. Although the

---

41. There is some evidence that this document, and the entire series of documents executed in late May 1995, may have been backdated. The Charitable Lead Trust is questionable on its face, as it purports to be dated on May 29, 1995, but is notarized by Scurlock three days earlier, on May 26, 1995. (Ex. 99.) Once again, Scurlock's notarization is in question, as there is no May 26, 1995 entry in her notary book. (Ex. 676.) Additionally, Hunter's billing records indicate that his partner, Glynn Blazier, was researching: "requirements of qualified lead annuity trust; Prepare draft documents" on July 12, 1995. (Ex. 3344, p. 80.) Additionally, Pierce had strong motivation to backdate the documents to May

26. On May 31, 1995, Glenn Johnson was appointed J. Howard's temporary guardian ad litem, thus any documents relating to his assets signed after that time might be called into question. The motivation to falsify, the irregularities of the document, the use of a discredited notary, work that appears to relate to the document after it was purportedly signed, and the pattern that Pierce, Hunter and Scurlock have demonstrated in falsifying and backdating documents give strong indication that these documents were also backdated. However, the evidence on this point is not as clear as the evidence of backdating of the other documents, and is unnecessary to this Court's findings.

Court cannot determine with certainty the date the document was actually signed, it does conclude that it was not signed in December 1994. This left J. Howard without the right to collect any income from his primary assets contained in the Living Trust, and he would therefore be unable to give any of it to Vickie. It also effectively cut-off Vickie's rights to demand payment from the Living Trust.

> ### viii. The Co–Trustees Resolution, purportedly dated February 7, 1995, that re-sited the trust from Houston, Texas to Calcasieu Parish (Lake Charles), Louisiana (Ex. 341)

Hunter's billing records indicate that work began on changing the situs of the trust on May 31, 1995. (Ex. 3344, p. 64.) On that day, Hunter spoke to Hilliard and Townsend about the issue. (Id.) He then had a conference with his partner Tim O'Dowd on the issue. (Id.) O'Dowd researched the issue on May 31 and June 1, 1995.(Id.) On June 5, 1995, O'Dowd wrote to Pierce on the issue. (Ex. 3344, p. 65.) On June 6, 1995, O'Dowd drafted "Resolution of Trustees for change of situs." (Id.) Thus, although the resolution purports to be dated February 7, 1995, it was in fact executed after June 6, 1995. By re-siting the Living Trust to Louisiana, Vickie would lose the ability to control the venue of the litigation, in favor of what Pierce and Hunter considered a more favorable "hometown."

## V. FINDINGS PROPOSED BY THE BANKRUPTCY COURT

Except to the extent that they are inconsistent with the findings of fact set forth in this order, this Court's de novo review upholds the findings of fact proposed by the bankruptcy court in its October 6, 2000 Original Decision, *Marshall I*, 253 B.R. 550.

### CONCLUSIONS OF LAW

## I. CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH AN *INTER VIVOS* GIFT[42]

 The bankruptcy court found that Pierce tortiously interfered with Vickie's expectancy of an *inter vivos* gift. The Texas Supreme Court[43] has never ruled on whether Texas recognizes a cause of action for tortious interference with an *inter vivos* gift. *See Brandes v. Rice Trust, Inc.*, 966 S.W.2d 144, 146 (Tex.App. 1998). In the absence of a settled rule of law enunciated by the highest court of the applicable state, a federal court should use its best judgment to predict how the highest state court would rule. *Ins. Co. of the State of Pennsylvania v. Associated Int'l Ins. Co.*, 922 F.2d 516, 520 (9th Cir.1990). In such a situation, the federal court should look to the decisions of intermediate state courts for guidance. *Id.* "Indeed,

---

**42.** When conducting a de novo review of the bankruptcy court's proposed findings of fact and conclusions of law, a district court must review "those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1). Pierce filed his brief on the merits on June 25, 2001, and his amended assignments of error on June 27, 2001. Pierce did not object to the bankruptcy court's reading of Texas law. On January 8, 2002, Pierce filed an additional brief on Texas law. That brief was untimely and in contradiction of the Court's August 27, 2001 Order stating that "[b]ecause the parties have already briefed the merits, no trial briefs need be submitted." Accordingly, Pierce's January brief is STRICKEN. Nevertheless, the Court addresses the issue of law *sua sponte*.

**43.** Neither side has contended that anything but the law of Texas applies. The Court therefore assumes without deciding that Texas furnishes the applicable law.

state intermediate appellate court decisions are not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.* (internal quotation marks and citation omitted).

■ Texas courts have recognized a cause of action for tortious interference with an inheritance. *King v. Acker,* 725 S.W.2d 750, 754 (Tex.App.1987) (citing *Tippett v. Hart,* 497 S.W.2d 606 (Tex.Civ. App.1973)). In finding that the tort existed, the court relied on the ancient maxim that the law will afford a remedy to every invasion of a legal right. *Id.* (citing *Chandler v. Welborn,* 156 Tex. 312, 294 S.W.2d 801, 807 (1956)); *accord Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803). It therefore adopted the position of the Second Restatement of Torts, which creates a cause of action against "[o]ne who by fraud, duress, or other tortious means intentionally prevents another from receiving from a third person an inheritance or gift that he would otherwise have received." Rest.2d Torts § 774B (1977). By adopting this position, the Texas court concurred with courts in most jurisdictions that also recognize this tort. Rest.2d Torts § 774B, Reporter's Note (1982 App.).

Pierce suggests that *King* is inapposite because it involved interference with an inheritance, not, as the present case does, interference with an *inter vivos* gift. However, the court in *King* indicated that the Restatement was the proper rule. *King,* 725 S.W.2d at 754. The same section of the Restatement that creates a cause of action for interference with an inheritance creates a cause of action for interference with a gift. *See* Rest.2d Torts § 774B. The same section should therefore be treated in the same manner. In the absence of a persuasive reason to the con-

trary, the Court is bound by the court's holding in *King* that Texas law adopts section 774B of the Restatement. *Associated Int'l Ins. Co.,* 922 F.2d at 520.

■ Pierce argues that public policy counsels against recognizing a tort for interference with a gift, because a thwarted donee can approach the donor to resolve the problem. While that is true as a general rule, in circumstances such as the present one, where the donor dies before the interference is discovered, the intended donee's sole remedy is with the courts. Indeed, public policy suggests that a cause of action for tortious interference with a gift is well founded. If a donor intends to give a gift to a donee during his lifetime, but is thwarted by the residual beneficiary of the donor's estate, equity demands that the heir not benefit from his wrongful conduct.

Accordingly, the Court's best judgment is that Texas law recognizes a cause of action for tortious interference with an *inter vivos* gift.

## II. ELEMENTS OF TORTIOUS INTERFERENCE WITH AN *INTER VIVOS* GIFT

■ Although Texas law does not specify the elements of a cause of action for tortious interference with an expectancy, other jurisdictions have clearly delineated the elements. *See, e.g., Doughty v. Morris,* 117 N.M. 284, 871 P.2d 380, 384 (1994). A plaintiff must prove (1) the existence of an expectancy; (2) a reasonable certainty that the expectancy would have been realized but for the interference; (3) intentional interference with that expectancy; (4) tortious conduct involved with the interference; and (5) damages. *Id.*

### A. Existence of an Expectancy

J. Howard made numerous promises to Vickie that she would receive half of what

he owned. These include promises on at least three occasions when he proposed to her: when J. Howard purchased the Tomball Ranch; when he purchased the 1992 Mercedes for her; and when he proposed to her in June 1994, which she then accepted. J. Howard made similar promises on other occasions in his proposals to Vickie and protestations of love for her. These promises are corroborated by J. Howard's pattern of wooing Lady Walker with his great wealth, and his proposals to Vickie were witnessed on at least one occasion by Harvey Sorensen.

Pierce argues that Vickie did not have a genuine expectancy of a gift because of various actions and public statements that she made. In particular, Pierce points to Vickie's appearance on the Howard Stern radio show two days before J. Howard's death. At that time, Vickie stated that she would not be getting anything from J. Howard's will. Not only is this statement technically correct, but it was made as part of a public relations campaign. As Vickie testified to in this Court, she did not want people to think that she had married J. Howard only for his money, as that appearance would harm her public persona and detract from her acting and modeling career. It is therefore entirely reasonable that she misled Howard Stern to improve her public image.

As set forth above, while Vickie may have thought he was prepared to give her half of everything he owned, Vickie's objectively reasonable expectancy, and the amount that J. Howard intended to give her, was half of his "new community." This term was defined by J. Howard as one-half of the growth of his assets during the time of their marriage.

The expectancy is also corroborated by the fact that J. Howard conferred on several occasions with his attorney about ways to make a substantial gift to Vickie, that would provide her with money after his death. This included several potential pre-nuptial agreements that contained gift clauses, his direction to Hunter to draft a "catch-all" trust, and his direction to Sorensen to create a legally enforceable gift of one-half of his new community. It is further corroborated by his knowledge that Vickie's career might be short-lived and he believed her to be "unteachable," so it would be necessary to provide for her in retirement.

### B. Reasonable Certainty of Realization But For Defendant's Conduct

■ A plaintiff must establish that there is a reasonable certainty that the gift would have been realized but for the defendant's conduct. The Comment to the Restatement notes that "complete certainty is impossible. It is not required." Rest.2d Torts § 774B, cmt. d. (1977). Instead, the Restatement requires only "proof of a high degree of probability that the" donor would have made the gift absent the defendant's conduct. *Id.* Moreover, "[t]he fact that it was the defendant's tortious act that makes it not possible to prove with certainty may be taken into consideration by the court." *Id.*

Here, Vickie has introduced evidence that shows a high degree of probability that J. Howard would have made a gift to Vickie. He directed two attorneys to prepare documents giving her a substantial gift as early as fall 1992. Although the gift was not feasible at that time due to the gift and generation-skipping tax burdens, there is no evidence that J. Howard ever retreated from his intention to give a gift to Vickie. Once he married her, the gift and generation-skipping tax consequences disappeared, and J. Howard would have been able to make a substantial gift. The evidence shows that through the very end of his life, Vickie was the most important

person to J. Howard. Pictures of them together during Christmas 1994 show an elated J. Howard. Tape recorded statements made by J. Howard in May 1995, less than two months before his death, demonstrate that he still believed that Vickie was "the light of his life," that she had "saved his life," and that he wanted her "to be supported by" him. (Ex. 364.) He stated that His actions seeking to have children with Vickie, either by adopting her son or by conceiving on their own, demonstrate that his commitment to provide for her only increased over time. Indeed, it was J. Howard who aggressively gave money to Vickie. He gave her more than anything she had explicitly asked for.

The evidence also demonstrates that it was Pierce's tortious conduct that makes it impossible to prove with certainty that the gift would have been realized. J. Howard placed a tremendous amount of trust in Pierce and Hunter who participated in acts intentionally designed to prevent J. Howard from giving Vickie a substantial gift or to undermine any will or gift that J. Howard signed when he was out of their presence. They presented documents for his signature which he was unable to read and signed documents on his behalf. Had they acted according to his frequently stated wishes, rather than to protect Pierce's interest in MPI and the valuation of Koch Industries, there is a high probability that J. Howard would have made a substantial gift to Vickie.

## C. Intentional Conduct

The evidence shows that Pierce and Hunter began undertaking estate planning transactions for J. Howard soon after they learned that he was seeking to make a substantial gift to her. All of these transactions were intended to drain J. Howard of his assets. Pierce's actions were intended to prevent a gift from being made to Vickie so as to not undermine the low valuations accorded to MPI and Koch stock. Allowing Vickie to have a gift based on the value of Koch stock could undermine his litigation position on the value of Koch stock with the dissident Koch shareholders and the IRS on gift and estate taxes. This would cost Pierce millions of dollars in tax litigation, and potentially endanger the liquidity of MPI. Thus, Pierce's actions were all made with the intention of preventing J. Howard from making a gift to Vickie.

## D. Tortious Conduct

A defendant's conduct must be "independently tortious in character." Rest.2d Torts § 774B, cmt. c. Evidence of Pierce's tortious conduct is legion. Acting in concert with Hunter, they backdated documents, altered documents, destroyed documents, suborned falsified notary statements, presented documents to J. Howard under false pretenses, and committed perjury.

## E. Damages

### 1. Entitlement

Vickie was damaged in the amount that J. Howard intended to give her. In December 1992, J. Howard told Harvey Sorensen that he wanted to give Vickie one-half of his "new community." (Ex. 62.) "New community" was a term J. Howard had developed, originally related to his marriage to Betty. He wanted Vickie to share in the growth of the assets that he owned and controlled during the time of their marriage. (Ex. 62.) The primary asset he held was his interest in Koch stock, held through MPI.

MPI holds 862,535 shares of Koch common stock, and has held that stock since at least the late 1980's. Prior to August 1993, when Pierce's string of estate planning changes began, J. Howard owned

164,252 shares of the then 236,440 outstanding shares of MPI stock, or approximately 69.5% of MPI. Vickie is therefore entitled to 69.5% of the appreciation in value of the 862,535 shares of Koch stock between the date that she and J. Howard married on June 27, 1994 and his death on August 4, 1995.

Vickie argues that she is entitled to the appreciation in the value of those shares from December 22, 1992, the date the "New Community Memo" was sent. Vickie claims that memo represented a present intent on J. Howard's part to make a gift to Vickie. However, there is no question that the new community that J. Howard referred to was not actually created until J. Howard married Vickie.

 The bankruptcy court awarded Vickie the appreciation from June 1994 to August 1999. Here, the ending date is less clear, because J. Howard's intent was to provide for Vickie in her retirement. Indeed the "New Community Memo" did not envision her being able to redeem the warrants from MPI until 15 years after J. Howard and Eleanor died. Although J. Howard has passed on, Eleanor still lives a vibrant and active life, and the end-date is therefore unascertainable. That, however, cannot serve to benefit Pierce, as equity will not allow a tortfeasor to gain by his own tort. The ending date chosen is necessarily somewhat arbitrary. However, August 1999, just before the trial in this matter, is completely disconnected from J. Howard's intent. August 4, 1995 is a more appropriate date, as that is the date that Vickie's and J. Howard's "new community" ended.

Pierce cites *Jensen v. Jensen,* 665 S.W.2d 107 (Tex.1984), for the proposition that, under Texas law, the appreciation in value of separate property held during marriage remains separate property. Pierce's argument, however, misses the mark. While that is an accurate statement of the law, it is not an accurate statement of the issues involved in this case. Had the appreciation become community property under Texas Law, Vickie would be entitled to half regardless of any tortious activity by Pierce. Here, however, the appreciation is relevant because J. Howard intended to give to Vickie a gift, from his separate property, of half of the appreciation of Koch stock. Pierce's argument is therefore unavailing.

### 2. *Valuation*

Determining how much the stock in Koch Industries appreciated between June 27, 1994 and August 4, 1995 is an even more difficult task. Koch is a privately held corporation, thus the Court cannot determine the value based on market trades. Litigation over the value of Koch Industries has consumed the time of many of the individuals involved in this case. Indeed, at one point in 1993, Merrill Lynch estimated that the value of Koch Industries was anywhere between $31.06 per share and $2,391.30 per share. (Ex. 681.)

Placing a value on a privately held corporation in general is a difficult task. Moreover, the Koch philosophy is vastly different from most businesses. Koch gives an extremely low rate of return to its shareholders in dividends, allowing the company to grow more rapidly. While that significantly reduces the present share value, it substantially increases the future value of the stock. The experts here have proffered testimony wildly at odds with each other.

### i. *Mike Hill*

In the bankruptcy proceedings, Pierce offered the expert testimony of Mike Hill to show the valuation of MPI. This testimony was stricken by the bankruptcy court as a sanction for Pierce's discovery

abuses, but is considered by this Court. Hill utilized the dividend yield method to calculate MPI's value. According to Hill, this was necessary because of the "onerous minority shareholder oppression options available to majority shareholders domiciled in the State of Kansas (like Koch ...)." (AP 017175.) However, by using the dividend yield method, the per share value of a company like Koch—that issues a very small dividend and reinvests its profits—is lower than its "inherent" value.

According to Hill, the per share value of MPI [44] as of the date J. Howard and Vickie married was $31,613,322.10. (AP 017180, 017187.) As of J. Howard's death, Hill valued MPI at $29,703,096.75. Hill's valuation would therefore entitle Vickie to no compensatory damages.

### ii. Wayne Elggren

Vickie presented Wayne Elggren as an expert on valuation. Elggren employed the guideline company method, whereby Koch's value was determined by reference to similar public companies in the field. Elggren did not calculate the value of MPI or Koch as of August 4, 1995. Elggren calculated the appreciation of J. Howard's approximately 70% interest in MPI from June 27, 1994 to August 30, 1999 (just before trial commenced in the bankruptcy court) at $899,508,268. The bankruptcy court awarded Vickie one-half of this amount, or $449,754,134, as compensatory damages.

### iii. IRS Settlement

For several years, the Marshall family interests have been involved in various tax litigation matters with the IRS. The IRS has made an offer to settle those cases. (Ex. 3573.) That settlement includes an imputed value of MPI and Koch stock. These settlement offers provide an additional valuation for Vickie's share of MPI and Koch stock holding. Accordingly, the Court makes the following calculations according to the values imputed by the IRS for Settlement purposes. (Ex. 3573, Schedule 9.)

On June 16, 1994, MPI had 222,535 shares of stock actually outstanding. The IRS value of MPI Voting Stock as of June 16, 1994 was $1,039.92 per share. Therefore, the IRS value of MPI as of June 16, 1994 was $231,418,597.20.[45] Because the IRS offer is premised on valuing MPI at 49% of the value of its Koch stock, the value of the Koch shares held by J. Howard through MPI can be set at $472,282,851.43 by dividing by 0.49.

On May 26, 1995, MPI had 208,470 shares of stock actually outstanding. The IRS value of MPI Voting Stock as of May 26, 1995 was $1,248.70. Therefore, the IRS value of MPI as of May 26, 1995 was $260,316,489. The value of the Koch stock held by J. Howard through MPI can therefore be set at $531,258,140.82

During the period of time covered by these transactions, MPI's interest in Koch appreciated by $58,975,289.39. The time period covered by these valuations is 344 days. Thus, the average daily appreciation of MPI's interest in Koch stock was approximately $171,439.79. J. Howard

---

**44.** Hill valued MPI, not Koch Industries. However, because Koch Industries stock is the major asset of MPI, determining the growth in Koch Industries can be determined by reference to it. The fact that MPI did not appreciate suggests that neither did Koch.

**45.** The amount of outstanding voting and non-voting stock is not clear on the record. However, the voting stock is valued only slightly higher than the non-voting stock. Because of Pierce's tortious and wrongful conduct, the Court draws the inference against him and uses the higher value for its calculation.

and Vickie were married during approximately this same period of time, and it is therefore fair to assume that the rate of appreciation during this period was approximately the same. By extrapolating the appreciation of the stock value during this time, the value according to the IRS settlement offer can be obtained. J. Howard and Vickie were married for 403 days. Thus, by multiplying the average daily appreciation of MPI stock during this period of time by 403 days, the Court finds that the appreciation in the value of MPI's interest in Koch stock was approximately $69,090,237.28.

Absent any fraudulent, wrongful, and tortious transactions, J. Howard would have owned 164,213 shares of MPI stock on June 27, 1994. Absent any fraudulent, wrongful, and tortious transactions, there would have been 236,600 shares of MPI outstanding as of June 27, 1994. Thus, on June 27, 1994, J. Howard would have owned approximately 69.4% of MPI stock. Absent any fraudulent, wrongful, and tortious transactions, J. Howard's ownership interest in MPI would have been identical at the time of his death on August 4, 1995.[46]

J. Howard's share of the appreciation in the value of MPI would therefore be approximately $47,952,304.03. Vickie is entitled to one-half of J. Howard's share of the appreciation of MPI's interest in Koch stock. Using the IRS Settlement numbers, this amount would be $23,976,152.02.

Although the IRS settlement is a reasonable method for calculating damages, the Court considers it inequitable to do so because it was negotiated by Edwin Hunter. As detailed above, Hunter was a key player in Pierce's tortious interference and the Court has no confidence in his credibility. Accordingly, Pierce should not have the benefit of Hunter's efforts in this Court.

#### iv. Book Value

The book value of MPI's interest in Koch stock is recorded in two credit approval presentations to Texas Commerce Bank. (Exs. 684, 685.) These presentations show a value of MPI's Koch stock of $664.4 million as of December 31, 1994 (Ex. 685) and $780 million as of December 31, 1995. This shows an annual appreciation of $115,600,000 and an average daily appreciation of $316,712.33. Because these valuations were taken near the time of J. Howard's marriage and death, it is fair to assume that the average daily appreciation during this time was the same as that during J. Howard's marriage to Vickie. Thus, the Court can extrapolate the appreciation of MPI's interest in Koch Industries during their marriage at $127,635,068.49. As noted in Part II.E.2.iii, *supra*, J. Howard's ownership interest in this would be approximately 69.4%, or $88,585,534.67. Vickie would be entitled to one-half of this, or $44,292,767.33.

---

**46.** The IRS settlement offer reflects several sales of stock by J. Howard to Pierce and sale of stock to MPI to cancel J. Howard's outstanding debt to MPI after August 20, 1993. As set forth above, Pierce's tortious conduct began to effect J. Howard's estate planning transactions in August 1993. Thus, the transactions after that date are tainted by Pierce's fraud, and are discounted by the Court. However, the offer does reflect the distribution to Pierce of 160 shares of MPI stock as compensation. Because Pierce had been receiving MPI stock distributions as part of J. Howard's long-held estate planning, the Court does include that transaction in its calculation. Additionally, the offer reflects a gift by J. Howard to "EM, PM, PM" on December 28, 1993. Because these appear to be legitimate Christmas gifts to J. Howard's family members, the Court does include that transaction in its calculation.

 The Court returns to first principles. "Fair Market Value" is defined as "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market in an arm's-length transaction." Black's Law Dictionary 1549 (7th ed.1999). Thus, while appraisers can estimate value, and several have attempted to do so in this case, the Court recognizes that the only real determination of value is when a sale takes place. Such a transaction ordinarily takes place after an often prolonged negotiation between buyer and seller, with each side attempting to create the best deal for themselves. Although no such situation presents itself in this case, resorting to the book value gives the Court some indication of the proper amount. The book value of the stock represented the collateral that MPI relied on for its line of credit. J. Howard and Texas Commerce Bank thought that book value was a sufficient valuation for regular business purposes. Pierce continued to rely on this when he took over MPI upon J. Howard's death. Indeed, the reports produced by Texas Commerce bank note that, as a privately held company, access to Koch's audited financial statement is limited and that historically the bank received updates of Koch's financial performance from Pierce. (Exs.684, 685.)[47] Accordingly, the Court accepts the book value of MPI as the appropriate measure of damages to be awarded to Vickie.

The Court finds itself in the quandary of finding that the facts are much more egregious than even the bankruptcy court suspected and found, yet awarding a substantially smaller amount of damages. However, the Court is bound to the facts that show that Vickie is entitled to a smaller, but still substantial, award.

### F. Punitive Damages

 "On a showing in a tort action that a defendant acted willfully, maliciously, fraudulently, or with gross negligence, there may be a recovery of exemplary damages, in addition to compensatory damages." *King,* 725 S.W.2d at 755; *see also* Tex.Civ.Prac. & Rem.Code Ann. § 41.003 (Vernon 1997). Willful, malicious, and fraudulent conduct must be shown by clear and convincing evidence. Tex-Civ.Prac. & Rem.Code Ann. § 41.003(b). Here, the evidence of willfulness, maliciousness, and fraud is overwhelming. Pierce and Hunter engaged in a pattern of deceiving J. Howard for nearly two years. They presented documents under false pretenses, suborned perjured notary oaths, falsified and backdated documents, and altered documents, all with the intent of denying Vickie the gift that J. Howard intended to make to her. Pierce was the primary beneficiary of these acts. Pierce had private investigators follow J. Howard when he left Texas to visit Vickie. In support of their plans, Hunter considered abusing the high office of a federal judge. Pierce's conduct continued even after J. Howard was dead, as he participated in a plan to solicit a federal judge and appears to have altered the Renunciation document in February 1996.

 Exemplary damages are levied against a defendant as punishment for outrageous behavior and malicious, fraudulent

---

47. Pierce contended at trial that based on the collateral of Koch stock, Texas Commerce Bank would agree to expand MPI's line of credit to cover the amount that it would owe to J. Howard between 1996 and 2001 for the sale of the Private Annuity, had he lived. That amount would be approximately $10 million per year, or $50 million between 1996 and 2001. Thus, if Pierce believed that Texas Commerce Bank was willing to extend MPI an additional $50 million line of credit, he must have also placed some reliance on the book value of MPI's Koch stock.

58

or other culpable conduct. *Trans. Ins. Co. v. Moriel,* 879 S.W.2d 10, 16 (Tex.1994). Like criminal penalties, the goal of punitive damages is to punish the defendant for his wrongful conduct. *Id.* Pierce now owns and controls all of Trof, Inc., MPI's successor in interest, which includes all the interest in Koch Industries that J. Howard held. MPI was valued at more than $260 million by the IRS six years ago. Furthermore, he holds additional amounts of Koch stock that he received either from J. Howard or acquired in other ways through the years. He also apparently has other significant holdings from his past employment as CEO of Electron Corp., and other interests unknown to the Court. In short, Pierce Marshall is an extremely wealthy individual. Small and nominal amounts will do little to deter wrongful conduct, and a substantial sum is warranted for the pattern of malicious conduct that continued on for several years.

In determining the amount of punitive damages to award, the Court must consider the reprehensibility of the defendant's conduct and the harm inflicted on the defendant, *In re Exxon Valdez,* 270 F.3d 1215, 1240–41 (9th Cir.2001), as well as the defendant's wealth, to determine the appropriate level of punitive damages. Here, the level of misconduct is far worse than even the bankruptcy court, which awarded $25 million in punitive damages, believed was present. The alteration of documents was not limited to the living trust and the plans to interfere with the administration of federal courts were hidden until discovery was finally extracted. Only because the Court recognizes that the amount of punitive damages must have a rational nexus to the actual damage award does the Court limit the total award to a doubling of the actual damages.

Accordingly, the Court assess punitive damages in the amount of $44,292,767.33.

## CONCLUSION

Any conclusion of law erroneously labeled herein as a finding of fact shall be deemed a conclusion of law. Any finding of fact erroneously labeled herein as a conclusion of law shall be deemed a finding of fact.

The Court finds and concludes that Vickie is entitled to judgment against Pierce on her counterclaim for tortious interference with an inter vivos gift, and awards compensatory damages in the sum of $44,292,767.33, plus costs of suit, plus punitive damages in the amount of $44,292,767.33.

IT IS SO ORDERED.